Cite as 2020 Ark. App. 524

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV–20–96

| | |
|---|---|
| TYLER SAMPLES | **OPINION DELIVERED:** NOVEMBER 18, 2020 |
| APPELLANT | APPEAL FROM THE CLAY COUNTY CIRCUIT COURT, EASTERN DISTRICT [NO. 11PPR–15–44] |
| V. | |
| DAVID LEE WARD AND CHRISTINE RENEE WARD | HONORABLE DAN RITCHEY, JUDGE |
| APPELLEES | REVERSED AND REMANDED |

## ROBERT J. GLADWIN, Judge

Tyler Samples ("Tyler") appeals the October 15, 2019 order of the Clay County Circuit Court denying his petition to terminate the guardianship of his minor daughter, P.Q.W., held by David Lee Ward and Christine Renee Ward ("Wards"). Tyler's argument that the circuit court erred in finding that he is unfit or that special factors existed is well taken; accordingly, we reverse the circuit court's order and remand for the entry of an order consistent with this opinion.

## I. *Facts and Procedural History*

The underlying facts of this case are largely undisputed. P.Q.W. was born on September 4, 2015. Her mother, Chelsea Elizabeth Ward, died unexpectedly on September 13 after experiencing complications with P.Q.W.'s birth. Tyler is P.Q.W.'s biological father. Tyler and Chelsea never married, and they separated in May 2015 before P.Q.W.

was born. Chelsea cut off all communication with Tyler, and he did not know about P.Q.W.'s birth until his mother told him a few days after she was born.

P.Q.W. was born with serious health issues that have required multiple surgeries. She had eye surgery to correct a cataract and remove the lens in one eye at six months of age. She had back surgery to implant a rod to treat her scoliosis around one year of age. She had a second back surgery at approximately two years of age and subsequently developed an infection, which resulted in the placement of a peripherally inserted central catheter ("PICC") line and treatment with intravenous antibiotics. P.Q.W. has continuing issues with her sight and her hearing. She requires daily eye-drop treatments, and she must return to Arkansas Children's Hospital ("ACH") on a bimonthly basis for X-rays and adjustment of the rod in her back, a process which is unpleasant and distressing for her. P.Q.W. faces multiple additional surgeries as she ages to treat her back and vision issues.

Chelsea and P.Q.W. lived with the Wards before Chelsea died, at which time P.Q.W. remained in their care. Shortly after Chelsea's death, the Wards approached Tyler about having "some papers drawn up" that would have provided that Tyler cede his parental rights to P.Q.W. After he refused that arrangement, on September 22, 2015, the Wards filed a guardianship petition for P.Q.W., arguing that she had lived with them since birth, has serious health issues, and should remain with them. Despite the fact that the Wards knew that Tyler is P.Q.W.'s father, they did not serve him with the guardianship petition. At the time of filing of the petition, Tyler's paternity had not been adjudicated.

The circuit court granted a temporary guardianship on September 24. On October 13, Tyler filed a motion to intervene in the guardianship case along with a petition for

2

paternity. In the eleven months that followed, Tyler did not directly contact the Wards about seeing P.Q.W. because he knew they were represented by counsel. Although he made efforts to see her through his lawyer, those efforts failed.

The circuit court twice extended the temporary guardianship—on December 17 and again on March 29, 2016. On September 1, Tyler and the Wards entered into an agreed order appointing the Wards as P.Q.W.'s permanent guardians. Tyler consented to the guardianship because he had not been able to see P.Q.W. regularly and had not yet developed a relationship with her. The agreed order stated that Tyler is the father but made no findings about his fitness. The order also imposed a graduating visitation schedule that eventually provided Tyler standard, unsupervised chart visitation as P.Q.W. got older. The order also provided that the Wards did not seek any financial support from Tyler. Tyler began exercising his visitation with P.Q.W. immediately after the agreed order was entered.

After more than two years of developing his relationship with P.Q.W., Tyler filed a petition to terminate the guardianship on January 18, 2019, alleging that a material change in circumstances had occurred—specifically that he was "now able to care for the minor child and provide a loving and stable home." On February 15, the Wards filed a response to the petition generally denying the allegations. The circuit court held a hearing on September 30 and heard testimony from the Wards, Tyler's mother, and Tyler.

David Ward testified that Tyler did not participate in Chelsea's prenatal care and confirmed P.Q.W.'s health problems at her birth. He explained that initially Tyler did not have any structured visitation with P.Q.W.—only what the Wards agreed to—and that Tyler relied on Mrs. Ward to notify him of events such as P.Q.W.'s surgeries. Mr. Ward

3

testified that P.Q.W. developed an infection and had to have a PICC line inserted, but that since the infection, she has required no other major surgical procedures, only "maintenance" treatment. Mr. Ward stated that that P.Q.W. loves Tyler, and he loves her. Mr. Ward testified that the only reason he opposed the termination of the guardianship was because of P.Q.W.'s health; specifically, her back, eyes, ears, and skin. Mr. Ward told the court he did not notify Tyler of important events in P.Q.W.'s life because of Tyler's work schedule.

Christine Ward testified that her concerns were about "[P.Q.W.], her well-being, her being ripped out of her environment." She admitted that Tyler had "very good" visitation with P.Q.W., and she referred to Tyler as "dad." Mrs. Ward acknowledged that Tyler keeps up with "visitation and things of that nature very well." She did complain that Tyler let his father take P.Q.W. to an appointment with her back doctor and that Tyler took P.Q.W. to a cotton field during the time she had the PICC line inserted to treat an infection. She acknowledged that she had not notified Tyler of all of P.Q.W.'s scheduled doctor's appointments. Mrs. Ward stated that much of her anxiety has to do with Tyler's father, who she thinks is controlling, and her fear of losing her relationship with P.Q.W.

Mrs. Ward testified that they phased in visitation with Tyler, first having them visit at McDonalds. But she acknowledged that they cut that plan short and allowed Tyler to start taking P.Q.W. sooner because they were comfortable with him taking her. She stated that since that time, neither she nor her husband had expressed any criticism to Tyler about his parenting of P.Q.W. Mrs. Ward confirmed that they let Tyler have P.Q.W. for six weeks over the previous summer.

4

Tyler testified that during the two years since he agreed to the guardianship, he has established a father-daughter relationship with P.Q.W., which is why he was seeking to terminate the guardianship. He explained that P.Q.W. has her own room at his house—that he shares with his father—and about an acre of land on which she can play. Tyler informed the court that he is now a manager at a Family Dollar store and that his schedule is more flexible. Tyler testified that he attends P.Q.W.'s doctor's appointments that he has sufficient notice of and that he would be able to go to future appointments if the guardianship was terminated.

Tyler explained that he has insurance through his employer and that through it, he can provide insurance for P.Q.W. He testified that he had investigated school districts for P.Q.W. and has a network of friends and family to help him. Tyler explained various details regarding P.Q.W.'s care when she stays with him, including changing diapers (when she was a baby), feeding her, and taking her to museums.

Regarding P.Q.W.'s medical condition, Tyler testified that he is up to date on all her issues, which are a "big concern" for him. He testified that he can schedule any appointments she may need and that he has paid time off at work for any required overnight stays. Tyler added that if he needs help, he would have no hesitation in asking the Wards for assistance. He also confirmed the Wards' testimony that they have never complained to him about his parenting and stated that he wants them to remain in P.Q.W.'s life—noting "[s]he needs all of us."

On cross-examination Tyler was asked about financial support for P.Q.W. He testified that he never paid any because the guardianship order did not provide for it. Tyler

stated that he took care of P.Q.W.'s expenses when she was at his house while the Wards did likewise when she was with them. He told the court that his relationship with P.Q.W. has grown over time, but he is sensitive to the difficulty of moving from one home to another and assured the court that he would meet her needs while keeping the Wards involved.

Responding to questions from the court, Tyler confirmed that his disabled father lives with him but does contribute to the household. He explained that no one else lives there. Tyler stated that he does not have a girlfriend, but he does have a female friend who has experience working with kids with health problems. Tyler noted that although he works fifty-two hours a week, he sets his own schedule, as he had worked his way up from a cashier to store manager since the time the guardianship started.

Tyler confirmed that he was aware P.Q.W. could not be on Arkansas Medicaid if she lived with him in Missouri. He testified that he intended to apply for Missouri Medicaid in addition to the insurance provided through his employment. He did tell the court that he had not, as of the time of the hearing, made any inquiries about how his insurance would apply to her current providers. But he testified that he is close to Cape Girardeau and St. Louis with access to good medical care there.

Also, during the hearing, the recent decisions in *Morris v. Clark*, *infra*, and *In re Guardianship of E.M.R.*, *infra*, were brought to the circuit court's attention. The court reviewed those decisions before ending the hearing to ensure that he had asked all pertinent questions in order to make a decision consistent with those rulings. The court also reviewed the ruling in the case of *Troxel v. Granville*, *infra*.

After hearing the evidence, observing the parties, and reviewing the current law regarding termination of a guardianship of a minor child, the court made the following determination:

> While the father may appear to meet the easy fitness hurdles of stability for employment and residence and lack of criminal history, the Court is not convinced, based on the Court's observation of the father's testimony and the careful consideration of all the evidence, the [father] can meet the true fitness test of whether a natural parent can "adequately care for his child," which is language from the *Troxel* case.
>
> Therefore, the court finds that the father is not fit or suitable at this time to fulfill his parental obligations and that there is a need for the guardianship to continue and that Mr. and Mrs. Ward continue to be suitable to serve and the guardianship continues to be in the child's best interest.

The court's order denying Tyler's petition for termination included multiple findings and noted several of them to be "significant" or "exceptional" circumstances: (1) the mother's death shortly after P.Q.W.'s birth; (2) that Tyler had the ability to provide financial support but did not except for during his visitation and "has never volunteered to accept his responsibility as a parent in that regard"; (3) that P.Q.W. had lived with the Wards since birth; and (4) that P.Q.W. has medical issues. The court denied Tyler's petition to terminate the guardianship in its order filed on October 15. Tyler filed a timely notice of appeal on November 14.

## II. *Standard of Review*

We review probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *In re Guardianship of E.M.R.*, 2019 Ark. 116, at 5, 571 S.W.3d 15, 18. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has

7

been made. *Id*. When reviewing proceedings, we give due regard to the opportunity and superior position of the circuit court to determine the credibility of the witnesses. *Id*.

### III. *Applicable Law*

Our supreme court recently reviewed the applicable legal authority and how it is applied in a case where a natural parent initially consented to a guardianship but later sought to terminate the guardianship. *E.g.*, *Morris v. Clark*, 2019 Ark. 130, 572 S.W.3d 366. Arkansas Code Annotated section § 28-65-401(b)(3) (Repl. 2017) provides in relevant part:

> (b) A guardianship may be terminated by court order after such notice as the court may require:
>
> . . . .
>
> (3) If, for any other reason, the guardianship is no longer necessary *or* for the best interest of the ward.

Ark. Code Ann. § 28-65-401(b)(3) (emphasis added). The statute's plain language contemplates that one can petition a circuit court to terminate an existing guardianship in either of two separate circumstances: when the guardianship is "no longer necessary" or when termination of the guardianship is "for the best interest of the ward." *Morris*, 2019 Ark. 130, at 4–5, 572 S.W.3d at 369. The statute also contemplates that the circuit court retains some level of discretion in these cases; specifically, that language stating that the guardianship "may be terminated by court order" under either of the statute's two prongs. *See id*. The *Morris* court analyzed the evolution of that part of the statute over the years and provided the following guidance:

> A natural parent who has not been declared unfit is presumed to act in his or her own child's best interest. This presumption is applicable when such a parent seeks to terminate an existing guardianship over his or her minor child pursuant to the Termination Statute. In this situation, parent's petition to terminate the guardianship need only "inform the court that the guardianship is no longer necessary." This is an

otherwise fit parent's only burden of proof; once that lack of necessity is communicated to the circuit court by a fit parent, the circuit court ordinarily would terminate the guardianship. The language contained in the Termination Statute does provide the circuit court some discretion in determining whether the guardianship should be terminated, but where the petitioner is a fit parent and the ward is the fit parent's minor child, the guardianship should only remain in place due to some circumstance "that could overcome (the petitioner's) fundamental right to raise (his or her) child."

We hold that a circuit court's determination that it would be in a minor ward's best interests for a guardianship to remain in place, standing alone, is insufficient to defeat a fit parent's substantive Due Process interest in raising his or her own child. There is a constitutional presumption that a fit parent acts in his or her child's best interests, so where the parent has not previously been found unfit, weighing "best interests" at the outset of the termination inquiry is inappropriate. The mere fact that a child may have more or better opportunities with another family cannot be enough to keep that child away from an otherwise fit parent.

None of this, however, should be construed to prohibit a guardian in such cases from actually raising and contesting the issue of the natural parent's "fitness" when the natural parent petitions to terminate the guardianship. Otherwise fit parents are presumed to be acting in their child's best interests, so the guardianship should only remain in place over the natural parent's wishes where the guardian defeats this presumption. To defeat this presumption, the guardian bears the burden of establishing that the natural parent is not fit. Importantly, whether a natural parent is "fit" is a very different question from whether it would be in a child's "best interest" to live with a natural parent or another family. Per the *Troxel* [*v. Granville*] plurality, "fitness" asks whether a natural parent can "adequately care for his or her children." If the natural parent is found to be unfit, then the natural parent is not entitled to the constitutional presumption discussed in *Troxel* and *Linder* [*v. Linder*], and the circuit court accordingly has greater discretion to determine whether to terminate the guardianship based upon the specific circumstances of a given case, including the best interests of the ward.

Accordingly, when a parent who has not previously been determined to be unfit petitions for termination of an existing guardianship over his or her minor child, circuit courts ordinarily should only decline to terminate the guardianship where the guardian contests the parent's fitness and establishes that the parent is presently unfit. Where an otherwise fit natural parent seeks to terminate an existing guardianship and the scenario described above is not implicated, the circuit court should dispose of the guardianship routinely.

*Morris*, 2019 Ark. 130, at 8–11, 572 S.W.3d at 371–72 (citations omitted).

Also, in *E.M.R.*, *supra*, our supreme court analyzed the statute in a case in which paternal grandparents obtained an emergency guardianship of E.M.R. after the mother's husband was charged with sexual abuse. The circuit court granted a permanent guardianship after a contested hearing but did not find the mother to be unfit. *Id.* at 3, 571 S.W.3d at 17. The mother received standard, unsupervised visitation—with an order for no contact with her husband. Twelve years later, the mother filed a petition to terminate the guardianship. The circuit court denied the petition finding that the mother failed to prioritize her kids and exercised poor judgment, although it did not explicitly find her unfit. *Id.* at 4, 571 S.W.3d at 17–18. The circuit court found that neither prong of the statute was met: (1) that the guardianship was no longer necessary or (2) that it was in the best interest of the ward. *Id.* Our supreme court reversed and, in so doing, affirmed the framework for these cases—when a parent who has never been adjudged unfit comes before the court asking to terminate a guardianship, the mere filing of the petition means that the guardianship is no longer necessary and that termination of the guardianship is in the best interest of the child. *Id.* at 7–8, 571 S.W.3d at 19–20. The appointed guardians then have the burden of showing unfitness or exceptional circumstances to overcome the fit-parent presumption. *See id.* The court held that the record did not rebut the presumption where the mother had stable employment, a suitable home, family support, a close relationship with the child, and consistent overnight visitation. *Id.* at 8, 571 S.W.3d at 20.

And in *Morris*, the mother petitioned to terminate her niece's guardianship over her child. The circuit court denied the petition because it found that Morris (1) had failed to exercise regular visitation; (2) did not have a stable residence; and (3) had a limited

10

relationship with the child; and that it was in the child's best interest to stay with the guardian. *Morris*, 2019 Ark. 130, at 4, 572 S.W.3d at 368. On appeal, the Arkansas Supreme Court acknowledged that although the statute affords the circuit court some discretion, when a fit parent states that the guardianship is no longer necessary, there must be proof of some circumstances that "could overcome [the parent's] fundamental right to raise [his] child." *Id.* at 9, 572 S.W.3d at 371. And the court held that a finding that it would be in the child's best interest for the guardianship to continue is not enough. *Id.* A guardian may contest fitness, but "[i]mportantly, whether a natural parent is 'fit' is a very different question from whether it would be in a child's 'best interest' to live with a natural parent of another family." *Id.* at 10, 572 S.W.3d at 371.

IV. *Analysis*

It is undisputed that as of January 18, 2019, when Tyler petitioned to have the guardianship over P.Q.W. terminated after more than two years of unsupervised and extended visitation, he had never been found to be unfit. Moreover, the Wards' argument at the hearing on Tyler's petition was merely "what about [P.Q.W.]?" Both Mr. and Mrs. Ward acknowledged that since they began allowing Tyler unsupervised visitation, neither of them had complained about his ability to parent P.Q.W. Accordingly, we hold that the circuit court's denial of Tyler's petition and finding that he is unfit despite the guardians' apparent concession on that point was clearly erroneous in that the circuit court conflated the concept of "unfitness" or "special factors" with an improper best-interest analysis under these specific facts.

11

## A. Tyler's Fitness

Tyler initially argues that the Wards did not contest his fitness. Pursuant to *Morris*, *supra*, the circuit court should decline to terminate a guardianship only when two conditions exist: (1) the guardians contest the parent's fitness, and (2) the evidence establishes that the parent is unfit. *Morris*, 2019 Ark. 130, at 10, 572 S.W.3d at 372. Here, the Wards' response to Tyler's petition consisted of a one-page general denial that did not allege, as an affirmative defense or otherwise, that Tyler was unfit. The Wards' attorney acknowledged as much in her opening statement at the hearing, telling the court that the Wards "do not really have any issues with [Tyler]. They do not have anything negative to say about him today. . . . They are not prepared today to say anything negative about Dad." Their concern, instead, was "what about [P.Q.W.]?" But as our supreme court conclusively held in *Morris*, the circuit court could not decline to terminate the guardianship by engaging in a best-interest analysis absent a finding that Tyler was unfit.

Moreover, the testimony at the hearing indicated more support of—than a challenge to—Tyler's fitness. Mr. Ward confirmed that they let P.Q.W. stay with Tyler for extended, unsupervised visitations. In explaining that his biggest concern was P.Q.W.'s health, Mr. Ward acknowledged that it was "under control." The most negative statement he made about Tyler was that he was not sure if Tyler went to all P.Q.W.'s doctor visits, but even then, he admitted that he never communicated those appointments to Tyler.

Mrs. Ward's testimony, likewise, was not an attack on Tyler's fitness. Her concerns, about "[P.Q.W.'s] well-being, her being ripped out of her environment" were tempered by an acknowledgement that Tyler has "very good visitation with [P.Q.W.]." The worst

12

comments she made about Tyler were that he let his father take P.Q.W. to an appointment with her back doctor and that he let her walk in a cotton field while her PICC line was inserted. But even then, Mrs. Ward admitted that she had not always given Tyler notice when a doctor's appointment had been made, and she conceded that the walk through the cotton field had not caused any harm and that P.Q.W. fully recovered from her infection. Finally, Mrs. Ward admitted that neither she nor Mr. Ward had expressed any criticism about Tyler's parenting of P.Q.W.

The fact that the Wards' attorney noted during the hearing, "The issue here today is whether the Court makes a finding that Mr. Samples is not fit to parent her," and the circuit court also noted that "once he withdraws his consent, I think that burden—you carry that burden, Ms. Whitby" is not indicative of the Wards' meeting their burden to rebut the presumption that Tyler is unfit. Tyler was afforded the presumption of fitness in accordance with the decisions in *Morris*, *E.M.R.*, and *Troxel*, and the burden was on the Wards to overcome that presumption and prove Tyler's unfitness to parent P.Q.W. under the special circumstances of this case. Although the circuit court is in a unique position to hear the testimony, observe the demeanor of the witnesses, and make a determination as to whether the Wards met their burden of proof, we hold that the record does not support the circuit court's eventual determination, and its finding that Tyler was unfit was clearly erroneous.

### B. Circumstances that Could Overcome Tyler's Fundamental Right to Raise P.Q.W.

Tyler next argues that the circuit court found that he was unfit through what was essentially a "best interest" analysis instead of adhering to the fundamental principle of a parent's right to raise his child. Tyler claims that the evidence presented was insufficient to

13

prove some circumstance that could overcome that fundamental right. Tyler asks this court to consider the "significant" or "exceptional" circumstances the circuit court relied on in finding him unfit and denying his petition to terminate the guardianship: (1) the death of P.Q.W.'s mother shortly after her birth; (2) that Tyler had the ability to provide financial support but did not volunteer to accept his responsibility as a parent in that regard except for during his visitation, and his testimony that the Wards accepted financial responsibility when they accepted the guardianship; (3) that P.Q.W. had lived with the Wards since birth with them acting as her parents; and (4) P.Q.W.'s medical history and condition.

We find merit in Tyler's argument that those findings were contradicted by the evidence presented to the circuit court. First, while acknowledging that Chelsea's death shortly after P.Q.W.'s birth is a significant circumstance, the reason Tyler was not involved with P.Q.W.'s birth was because Chelsea cut off all communication with him when they broke up during her pregnancy. He relied on communication from their parents to keep him informed, and his mother did not alert him of P.Q.W. until days after her birth.

Next Tyler acknowledges that he did not offer to pay child support, but the agreed order drafted by the Wards' attorney and presented to Tyler specifically provided that the Wards did not seek any child support from him. Moreover, it is undisputed that Tyler did pay for any expenses P.Q.W. incurred when she was with him for visitation. Under these particular facts, Tyler should not have been penalized by the circuit court for his testimony that he believed the Wards accepted financial responsibility for P.Q.W. when she was with them pursuant to the order granting guardianship.

14

While it is undisputed that P.Q.W. has lived with the Wards since her birth, the evidence before us does not support a finding that the circumstance was based on a lack of fitness on Tyler's part. Further, Tyler exercised all available visitation with P.Q.W., including six full weeks in the summer preceding the hearing. And the Wards specifically testified that they allowed extended, unsupervised visitation earlier than anticipated because they felt comfortable doing so based on Tyler's ability to care for P.Q.W.

Finally, the circuit found P.Q.W.'s medical history and condition to be an exceptional circumstance and noted that Tyler had not been involved in her medical history or care, "although he may have some familiarity with the medical issues or may have had some minor involvement through visitation." Although the circuit court's finding that the Wards have been appropriately addressing P.Q.W.'s health issues is supported by the evidence, its finding that Tyler has made no inquiry or developed any plan to deal with P.Q.W.'s future medical care is not. The record before us indicates that Tyler presented evidence to the circuit court regarding his plan for P.Q.W.'s medical care—insurance coverage for P.Q.W. available through his work as well as investigating supplemental insurance for her through Missouri Medicaid. He also explained that he had access to two large cities, Cape Girardeau and St. Louis, where P.Q.W. could receive adequate medical care for her issues. The circuit court appears to hold Tyler to an unreasonable standard of knowing specific details of P.Q.W.'s treatment and care before she has had an opportunity to be evaluated by a physician in his area. Available technology utilized in the medical and insurance fields routinely fosters smooth transitions between providers; accordingly, we do

15

not agree that this issue is sufficiently exceptional to overcome Tyler's fundamental right to raise his daughter.

Tyler cites *Moore v. Sipes*, 85 Ark. App. 15, 146 S.W.3d 903 (2004), in which the mother appealed from an order appointing the paternal grandparents as guardians of her children. This court held that Moore was not unfit and that it was not a situation in which she had engaged in egregious conduct that would call her fitness into question. *Id.* at 21, 146 S.W.3d at 908. Although she had moved a lot and not been the best mother, the court stated that "the evidence showed she was working and was concerned about the children and trying to see to their welfare." *Id.*

A more recent case from our supreme court provides additional guidance. In *In re Guardianship of W.L.*, 2015 Ark. 289, 467 S.W.3d 129, a termination-of-guardianship case by the parents, one issue was the circuit court's finding that the father was unfit based on his lack of communication with the guardians, his failure to help with W.L.'s medical bills, an online dating account with "Fet Life" (presumably a site catering to sexual fetishes), his refusal to cooperate with the guardians about medical care, and lies he told to the guardians about his whereabouts with the child. 2015 Ark. 289, at 11–12, 467 S.W.3d at 135–36.

Our supreme court held that none of those things go to the issue of fitness and acknowledged that the facts might be relevant in a change-of-custody battle but "have no bearing on the father's ability to provide for W.L.'s basic needs." *Id.* at 13, 467 S.W.3d at 136. Perhaps more relevant to this case, the court noted that W.L. had spent two six-week summer vacations with the father, and "if the court authorizes a parent to have extended,

16

unsupervised, and out–of–state visitation, *then that provides strong evidence that the parent is fit*." *Id.* at 14, 467 S.W.3d at 137 (emphasis added).

The facts in this case are substantially similar. Tyler initially consented to the guardianship because he had not yet developed a relationship with P.Q.W., but once he did, he consistently exercised extended and unsupervised visitation with P.Q.W. for at least two years. And during that time, neither of the Wards complained about his parenting skills.

In *W.L.,* our supreme court noted that circuit courts considering guardianship cases should encourage a parent's efforts to improve his or her lot. Guardianships may serve a useful purpose in situations such as this one in which a parent may find that, for a while, his child may be better off with grandparents. But as our supreme court noted in *W.L.,* such a "parent should not then be punished for that foresight by making it an impossible burden to regain custody of that child." *Id.* at 15, 467 S.W.3d 137. And in this case, Tyler should not be punished for consenting to the guardianship until his relationship with his daughter and his ability to successfully raise her evolved to the point that he felt comfortable filing a petition to terminate it.

Tyler's bond with P.Q.W. as her father is recognized by our courts as one of the most fundamental of rights. Because Tyler is a presumptively fit parent, once he petitioned the circuit court for termination of the guardianship, the burden was on the Wards to show he was unfit or some other special factors sufficient to overcome his fundamental right to raise his daughter. Here, the Wards did not attempt to argue Tyler was unfit, and the "significant" and/or "exceptional" factors recited in the circuit court's order amount to an incorrect de facto best-interest analysis. Accordingly, we hold that the circuit court was

17

clearly erroneous in denying Tyler's petition to terminate the guardianship and reverse and remand for the entry of an order consistent with this opinion.

Reversed and remanded.

GRUBER, C.J., and HARRISON, J., agree.

*James F. Gramling, Jr.*, for appellant.

*Lori L. Whitby, P.A.*, by: *Lori L. Whitby*, for appellees.