Cite as 2023 Ark. App. 386

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-22-522

| | |
|---|---|
| TERRI SIMMONS | Opinion Delivered September 13, 2023 |
| APPELLANT | |
| | APPEAL FROM THE YELL COUNTY CIRCUIT COURT, NORTHERN DISTRICT [NO. 75NPR-21-102] |
| V. | |
| BRYAN STEELE | HONORABLE DAVID H. MCCORMICK, JUDGE |
| APPELLEE | |
| | AFFIRMED |

**MIKE MURPHY, Judge**

Appellant Terri Simmons appeals from the Yell County Circuit Court's termination

of her temporary guardianship of her grandchildren, Minor Child 1 (MC1) (DOB: 05-29-18)

and Minor Child 2 (MC2) (DOB: 12-03-10). On appeal, Simmons argues the court erred in

affording appellee Bryan Steele the fit-parent presumption in terminating the guardianship.

We affirm.[1]

---

[1]There are different statutory requirements for granting a guardianship and terminating a guardianship; namely, in creating a guardianship the court must consider whether the guardian is "qualified and suitable" and what is in the ward's best interest. *See* Ark. Code Ann. § 28-65-204 (Repl. 2012). Parental fitness is not a consideration in establishing a guardianship. *See Fletcher v. Scorza*, 2010 Ark. 64, 359 S.W.3d 413. Following suit with the circuit court, we analyze this case as a termination of guardianship. *See Munn v. Hudson*, 2011 Ark. App. 775.

On December 14, 2021, Terri and Dale Simmons petitioned the court for a temporary guardianship of their two grandchildren, alleging the minors were in imminent danger of environmental neglect or abuse specifically due to the drug use of their daughter, Beverlee.[2] According to the petition, Beverlee would frequently leave her minor children at the Simmonses' residence and not return for days or weeks at a time. The petition also alleged that Bryan Steele, MC2's father, "frequently leaves [MC2] in the care of other supervising adults while she stays at his residence. [MC2] frequently returns to Petitioners' residence from her father's residence extremely hungry, as if she is not fed at her father's residence. [MC2] also returns from Mr. Steele's residence with head lice." Last, it alleged that Brian Thomas is the possible father of MC1 but that he has never had a relationship with the child, and his whereabouts are unknown.[3] An ex parte order of emergency guardianship was entered. A probable-cause hearing was conducted, and the court granted a temporary guardianship. Notably, in the granting of the temporary guardianship, the court did not make a finding that Steele was unfit.

On March 11, 2022, the Simmonses filed a petition to extend the guardianship. On March 14, Steele moved to terminate the guardianship and requested a hearing. In the motion, he alleged he was served summons just fifteen minutes before the probable-cause hearing and was unable to attend. On March 23, the Simmonses filed a response to the

---

[2]Dale is not a party to the appeal.

[3]Thomas was never married to Beverlee and has never filed a paternity action.

2

motion to terminate the guardianship asserting that Steele has never established a parent-child relationship with MC1 as corroborated by the fact that MC1 had lived with the Simmonses for over a year. The motion further alleged that Steele had failed to provide housing, medical care, clothes, or supervision over MC1 and that the Simmonses had assumed these responsibilities. They alleged "the guardianship is still necessary because (1) the mother, Beverlee Steele, is still without a known residence and is likely still addicted to drugs, (2) Brian Thomas' whereabouts are still unknown, and (3) Bryan Steele/Petitioner has consistently neglected [MC2]."

A hearing was conducted on May 3. Steele testified to the following. He has been married to Beverlee for sixteen years, but they have been separated for the past six years. He testified that they have not divorced, but he lives with his fiancée. He and his fiancée share two children. MC2 is his biological child, and MC1 was born during his marriage to Beverlee. Steele and Beverlee also have a fourteen-year-old daughter, Minor Child 3 (MC3). MC3 currently lives with Steele and his fiancée.

Steele is self-employed as a handy man and has five rental properties. He said Beverlee told him that MC1's biological father had "gotten on something" and disappeared, and that is why he never signed away his rights to her. He stated that, at times, Beverlee and the children, including MC1, stayed with him when they needed shelter. Steele was not certain of MC1's age or birthday, but he testified that she thinks he is her father, and it is his request that he raise her as his own. He testified that, while he has never provided for MC1's medical needs, he made it clear to the Simmonses that if they need anything they could contact him.

Steele testified he was currently unaware of Beverlee's whereabouts. He thought she was living with the Simmonses until this case was initiated and he found out Ms. Simmons asked her to leave. He testified that the first time he was made aware that Beverlee was not with the children, he went to the Simmonses and brought the children to his home. After three weeks of having his children, he said he allowed them to visit the Simmonses for a weekend, and upon picking them up, Beverlee was there. She told him she had been there the whole time, and the children remained with her. That was when MC3 chose to stay with Steele, and no one took issue with it. MC3 was still residing with Steele at the time of the May 3 hearing.

Terri Simmons testified that Beverlee left because they would not let her and her boyfriend sleep in the same bed. Simmons testified that she did not notify Steele when Beverlee left because she assumed he knew as he had been in contact with Beverlee. She testified that after becoming the temporary guardian, she was returning one of the children to Steele after a visit, and Steele said that he understood why the Simmonses sought guardianship and that he would not interfere. Simmons testified that MC1 had been with her and her husband off and on since MC1 was a few months old. Simmons said that she tried to stay out of Beverlee and Steele's marriage and that she did not feel it was her place to demand any support from them because Beverlee was still sometimes supporting the children. She stated that Beverlee had indicated that Steele would provide support if she asked for something in particular. Simmons testified that she took the necessary steps to make sure MC1 and MC2 had health insurance.

4

Following the hearing, the circuit court entered an order terminating the temporary guardianship of the minor children, finding that the temporary guardian "failed to prove the legal father unfit," and thus, that the guardianship was no longer needed under the law. This appeal followed.

We review probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Mossholder v. Coker*, 2017 Ark. App. 279, at 8, 521 S.W.3d 150, 155. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.*

A guardianship may be terminated by court order if it is "(A) no longer necessary; and (B) no longer in the best interest of the ward." Ark. Code Ann. § 28-65-401(b)(3) (Supp. 2023). In *Troxel v. Granville*, 530 U.S. 57, 68–69 (2000), the United States Supreme Court held that "there is a presumption that fit parents act in the best interests of their children," and

> so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

If the natural parent is found to be unfit, then he or she is not entitled to the fit-parent presumption. *Morris v. Clark*, 2019 Ark. 130, 572 S.W.3d 366. In *Donley v. Donley*, 2016 Ark. 243, 493 S.W.3d 762, and *In re Guardianship of W.L.*, 2015 Ark. 289, 467 S.W.3d 129, our supreme court held that the guardianships were no longer necessary once a fit parent revoked

his or her earlier given consent to the guardianship. In *In re Guardianship of E.M.R.*, 2019 Ark. 116, at 7, 571 S.W.3d 15, 19, the supreme court expanded the fit-parent presumption to a fit parent who did not consent to a guardianship, holding that such a parent "must still be afforded a natural parent's constitutional right to raise his or her child without undue interference from the government" as recognized in *Troxel*.

Simmons argues the termination was erroneous because by affording Steele the fit-parent presumption, neither prong of Ark. Code Ann. § 28-65-401(b)(3)—necessity and ward's best interest—was satisfied. To support her argument, she contends the statute must be strictly construed, and it does not require a showing that a parent is unfit. We disagree.

Our supreme court has consistently held that "parental fitness is at the heart of termination-of-guardianship cases involving parents of minor wards." *In re Guardianship of E.M.R.*, 2019 Ark. 116, at 7, 571 S.W.3d at 19. Guided by this principle, we note that Steele has not previously been deemed unfit and is, therefore, entitled to the fit-parent presumption. By petitioning to terminate the guardianship, the fit parent, who has the child's best interest at heart, informs the court that the guardianship is no longer necessary. *See Donley*, 2016 Ark. 243, 493 S.W.3d 762.

Accordingly, once Steele notified the court he wished to terminate the guardianship, Simmons had the burden of proving Steele's unfitness or to show exceptional circumstances that would overcome the fit-parent presumption, but she did not do so. Notably, she testified that she did not know if Steele was an unfit father, she did not express concerns for MC3 living with Steele, and she did not have concerns with allowing Steele to have regular,

6

unsupervised visitation with MC2. Moreover, the reasons for the guardianship stemmed mainly from concern for Beverlee's—not Steele's—parenting. This evidence additionally supports a finding that the guardianship is no longer necessary.

Turning to the second prong of the statute, whether the guardianship is no longer in the best interest of the wards, because Steele has not been found unfit, he is entitled to the presumption that he is acting in the best interest of his children. We acknowledge the court's concern in not making a specific best-interest finding as the court conceded that the best-interest inquiry might dictate that the children not go back with Steele. In doing so, the court noted that it had concerns about whether the children were being fed and why they had head lice. But the court then acknowledged Simmons' candid admission that she did not know whether Steele was unfit and that there had been no evidence as to why the children were hungry—were they just not eating enough or did they just not like what was being served.

The court also expressed concern that most of Simmons' testimony consisted of hearsay statements from people not present at the hearing; for example, Simmons' testimony that Beverlee informed her whether Steele would provide support and that the children informed her about their arrangements at Steele's house during visits. Given the paucity of evidence revealing that these issues were the result of neglect, the court determined that its lingering concerns were insufficient to rebut the fit-parent presumption and that a best-interest analysis would therefore be superfluous.

We agree, in light of this record, that there is nothing to rebut the presumption that Steele is unfit. We have recognized that whether a natural parent is "fit" is a very different question from whether it would be in a child's "best interest" to live with a natural parent. *See Samples v. Ward*, 2020 Ark. App. 524, at 11, 614 S.W.3d 830, 837. Specifically,

> Per the *Troxel* plurality, "fitness" asks whether a natural parent can "adequately care for his or her children." *Troxel*, [530 U.S. at 68]. If the natural parent is found to be unfit, then the natural parent is not entitled to the constitutional presumption discussed in *Troxel* and *Linder*, and the circuit court accordingly has greater discretion to determine whether to terminate the guardianship based upon the specific circumstances of a given case, including the best interests of the ward.

*Morris v. Clark*, 2019 Ark. 130, at 10, 572 S.W.3d 366, 371–72.

Further, as the *Troxel* plurality opined, some level of "special weight" must be afforded to a fit parent's preference as to what should happen to his or her child. *Morris*, 2019 Ark. 130, at 11, 572 S.W.3d at 372. In order to rebut the presumption, Simmons could have either proved Steele unfit or shown exceptional circumstances sufficient to overcome the fit-parent presumption. Accordingly, despite Simmons' contention, the fit-parent presumption does not negate the statute's mandatory consideration of the best-interest prong.

Alternatively, Simmons argues that the record establishes Steele is unfit and a guardianship is needed because the best interest of the children is for the guardianship to remain. As explained above, there has not been a finding that Steele is unfit, and Simmons has not overcome the presumption of parental fitness. Further, our courts do not recognize a de facto finding of parental unfitness, nor can a court retroactively declare a parent unfit. *In re Guardianship of E.M.R.*, 2019 Ark. 116, at 6, 571 S.W.3d at 19.

8

In conclusion, as we held in *Morris*, 2019 Ark. 130, at 9, 572 S.W.3d at 371, "The mere fact that a child may have more or better opportunities with another family cannot be enough to keep that child away from an otherwise fit parent."

Affirmed.

HARRISON, C.J., and THYER, J., agree.

*Robert S. Tschiemer*, for appellant.

One brief only.