Cite as 2026 Ark. App. 126

# ARKANSAS COURT OF APPEALS
## DIVISION II
No. CV-24-462

| | |
|---|---|
| DANIEL MADDOX <br><br> APPELLANT <br><br> V. <br><br> AARON OWENS AND CAROL OWENS <br> APPELLEES | Opinion Delivered: February 25, 2026 <br><br> APPEAL FROM THE BENTON COUNTY CIRCUIT COURT <br> [NO. 04PR-22-578] <br><br> HONORABLE JOHN R. SCOTT, JUDGE <br><br> REVERSED IN PART; REMANDED IN PART |

### STEPHANIE POTTER BARRETT, Judge

Daniel Maddox ("Daniel") appeals from the April 12, 2024, order of the Benton County Circuit Court denying his petition to terminate the guardianship of his minor child, MC (DOB 03/17/2019), and the April 22, 2024, order requiring him to pay attorney ad litem fees. On appeal, Daniel argues the circuit court (1) erred by finding that he is an unfit parent; (2) erred by finding that exceptional circumstances exist in this case that overcome the fit-parent presumption; and (3) abused its discretion by ordering him to pay over half of the attorney ad litem's fees. We find merit in his arguments and reverse the circuit court's order denying the petition to terminate the guardianship, and we reverse and remand the circuit court's separate order awarding attorney ad litem fees.

On May 31, 2022, Carol Owens and Aaron Owens (the "Owenses"), who are the aunt and uncle of Carmen Vaughn, MC's mother, filed a petition for guardianship of MC. The petition was filed after Carmen's death in a motorcycle accident. On June 1, 2022, the circuit court entered an ex parte guardianship appointing the Owenses as temporary guardians pending a hearing. Following a June 6, 2022 hearing, the circuit court appointed the Owenses temporary guardians of MC's person and estate.

On July 22, 2022, Daniel filed a motion to intervene, which the circuit court granted the same day. Daniel then filed a petition to terminate the guardianship, alleging that he is MC's biological father, resides in Kansas, had not consented to a guardianship, and was being intentionally alienated from MC. Daniel asserted that he is not an unfit parent.

On August 16, 2022, the Owenses filed a motion requesting the appointment of an attorney ad litem for MC. On August 26, the circuit court entered an order appointing the Owenses guardians of MC's person and estate, acknowledging that Daniel consented to the guardianship pending a hearing on his termination petition. Daniel filed his consent to the guardianship on August 29. The circuit court appointed an attorney ad litem for MC on August 30.

Following the guardianship appointment, the parties implemented a step-up visitation schedule through a series of agreed orders. Daniel was permitted supervised in-person visitation, with progression to unsupervised and overnight visitation based on completion of required supervised visits and counselor recommendations. In July 2023, the parties agreed Daniel would have one supervised visit followed by unsupervised daytime visits

and overnight visitation in Northwest Arkansas. In November 2023, the parties agreed to several overnight visits in Northwest Arkansas with potential expansion to additional overnights and visits in Kansas, including two overnight visits.

On March 1, 2024, Daniel filed an amended petition to terminate guardianship, alleging he had been involved in MC's life since birth; that the Owenses knew how to contact him; and he was the fit and proper person to care for MC.

The circuit court held a trial on Daniel's amended petition to terminate guardianship on March 19 and 22, 2024. MC's counselor, Erica Sturgeon ("Erica"), testified that MC began grief therapy in October 2022, and she began seeing MC individually in August 2023. Erica first met Daniel in September 2023. She testified that Daniel was initially resistant to therapy but later became engaged, attended sessions, and provided regular updates. She acknowledged three occasions when Daniel did not provide her with twenty-four hours' notice that he could not attend. Erica testified that Daniel participated in therapy in good faith, had no propensity for violence or issues with alcohol or drugs, and expressed no concerns about his ability to parent MC, though she recommended a gradual transition if he were to receive full custody. She further emphasized the importance of MC continuing counseling.

Daniel testified that he resides in Wichita, Kansas, in a four-bedroom house with his cousin, his cousin's wife, and his fiancée. Daniel stated he worked for Clean 316, LLC, as a consultant and reported paying himself approximately $1,200 to $1,500 gross a month. He further testified that his cousin pays the rent and helps him financially when needed.

Daniel acknowledged that he is the registered agent for Clean 316, LLC, and pays himself through that business at a salary he determines. He stated that the charter for Clean 316, LLC, had been revoked and that several other business entities he had formed were no longer active. Daniel works remotely and stated he would stop traveling for work if awarded custody.

Daniel testified he attended Carmen's prenatal appointments, was present for MC's birth and remained in Arkansas for approximately one week afterward, and that he saw MC almost every two weeks. Daniel later testified that he saw MC only once or twice a month while Carmen and MC were living in Oklahoma City. He stated that he sent money to Carmen for MC through direct deposit or Facebook Messenger, and at times, he paid her phone and car expenses. Daniel testified that communication between Carmen and him ceased around November 2021 after Carmen began dating someone who did not want her to have contact with him. Daniel explained that he did not seek court intervention at the time because he believed the situation would resolve. Carmen died approximately six months later. Daniel testified that he attempted to attend Carmen's funeral, but Aaron Owens asked him to leave.

Daniel testified that after he learned of the guardianship, he immediately took action and thereafter exercised all visitations granted by the court, including weekly phone contact. He testified that he selected a school for MC, researched health insurance coverage, and prepared a bedroom for MC at his home. Daniel testified he has two other children, one

living nearby whom he sees without a set schedule and one in Florida whom he has never met. He has a child-support arrearage for both children.

Carmen's sister, Whitney Evans-Smith ("Whitney"), testified she has a negative opinion about Daniel because she did not think that Daniel had been involved in Carmen's or MC's lives but acknowledged she did not know if Carmen ever took MC out of state to visit Daniel. Two of Carmen's ex-boyfriends testified, Gary Holt ("Gary") and Dakota Poe ("Dakota"). Gary and Dakota testified they did not recall frequent visits by Daniel, though Dakota acknowledged that Daniel had reached out to Carmen asking to spend time with MC after he turned three. Carmen's stepfather, Michael Lowe ("Michael"), testified that Daniel visited Carmen twice during the pregnancy and again at MC's birth.

Aaron Owens ("Aaron") testified that he met Daniel only once before filing for guardianship. He stated that Carmen and MC lived with the Owenses for part of Carmen's pregnancy and for approximately seven months after MC's birth. Aaron testified that his negative opinion of Daniel was based on what others told him, not personal interactions.

Carol Owens ("Carol") testified regarding her and her husband's involvement in MC's life and the assistance they gave to Carmen. She testified that since they had been appointed MC's guardian, Daniel had not offered any child support or bought MC any birthday or Christmas gifts. She testified that the visits she observed between MC and Daniel had gone well. Carol stated Daniel is unfit because he does not earn enough money and does not have a house of his own.

Daniel's cousin, Ryan Maddox ("Ryan"), testified that he earns over six figures a year, pays the rent for the four-bedroom house that he shares with Daniel, provides Daniel with financial assistance, and would continue to help him financially if needed. Ryan testified that Carmen and MC visited Daniel in Kansas six or seven times.

On March 28, 2024, the circuit court denied Daniel's petition to terminate the guardianship. The circuit court found that Daniel was hesitant to engage with MC's counselor and noted missed sessions, Daniel had no contact with MC from November 2021 to July 2022, and Daniel's testimony was inconsistent and less credible than that of other witnesses. The circuit court emphasized Daniel's confusing and inconsistent testimony regarding income and finances, his reliance on family members for living expenses, his ownership of a business with a revoked charter, and his creation of other defunct business entities. The circuit court further found that Daniel has not consistently maintained a valid driver's license, lacks stable transportation, and has driven while unlicensed.

The circuit court found that Daniel has never provided MC with a birthday gift or Christmas gift, provided only some financial support before the guardianship, and provided no financial support after the guardianship began. The circuit court further found that Daniel has two other children, had never met one child, and owed child-support arrearages.

The circuit court acknowledged that Daniel had properly engaged in counseling, exercised all court-ordered visitation, and initially consented to the guardianship because he believed stability was best for MC following Carmen's death. In light of these findings, the circuit court found Daniel to be an unfit parent. *Id.* Alternatively, the circuit court found

6

that exceptional circumstances existed to overcome the fit-parent presumption, including Daniel's historical lack of caregiving, inconsistent contact, lack of financial support since the guardianship, lack of involvement and support of his other children, financial dependence on family members, and lack of stable transportation and licensing; MC's ongoing counseling needs; and the stability provided by the Owenses.

The circuit court also dismissed Daniel's petition to terminate the guardianship, ordered visitation under the court's suggested visitation schedule, ordered MC to continue counseling and the parties to participate in co-parenting counseling, imputed full-time minimum-wage income to Daniel, set child support at $182 a month, and established an arrearage.

On April 22, 2024, the circuit court allocated $1,250 of the attorney ad litem fees to be paid from the Administrative Office of the Courts funds and ordered Daniel to pay the remaining $1,840.06 in fees within thirty days from the entry of the order. This appeal followed.

We review guardianship proceedings de novo but will not reverse the circuit court's findings of fact unless they are clearly erroneous. *Simmons v. Steele*, 2023 Ark. App. 386, at 5–6. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* When reviewing the proceedings, we give due regard to the opportunity and superior position of the circuit court to determine the credibility of the witnesses. *Donley v. Donley*, 2016 Ark. 243, at 6, 493 S.W.3d 762, 766.

7

The law recognizes a strong presumption in favor of a fit parent. In *Troxel v. Granville*, 530 U.S. 57, 68–69 (2000), the United States Supreme Court held that "there is a presumption that fit parents act in the best interests of their children," and so long as a parent adequately cares for his or her child, there is ordinarily no basis for the State to intrude into the private realm of the family or second-guess a parent's ability to make the best decisions concerning the rearing of his or her child. When a natural parent is found to be unfit, the fit-parent presumption no longer applies. *Morris v. Clark*, 2019 Ark. 130, 572 S.W.3d 366. Likewise, guardianships are no longer necessary once a fit parent revokes his or her earlier given consent to the guardianship. *Donley v. Donley*, 2016 Ark. 243, 493 S.W.3d 762; *In re Guardianship of W.L.*, 2015 Ark. 289, 467 S.W.3d 129.

Daniel argues that the circuit court erred in finding him unfit absent clear evidence that he has manifested such indifference to MC's welfare as to demonstrate a lack of intent to discharge his parental duties. A natural parent who has not been declared unfit is presumed to act in his or her own child's best interest. *Morris v. Clark*, 2019 Ark. 130, at 8, 572 S.W.3d 366, 371. This presumption is applicable when such a parent seeks to terminate an existing guardianship over his or her minor child pursuant to Arkansas Code Annotated section 28-65-401(b)(3) (Supp. 2023).[1] A guardianship may be terminated by court order if it is "(A) no longer necessary; and (B) no longer in the best interest of the ward." *Id.* The

---

[1]Arkansas Code Annotated section 28-65-401 was amended effective August 5, 2025. This opinion analyzes the version of the statute in effect at the time of the circuit court's ruling.

8

circuit court should decline to terminate a guardianship only when two conditions exist: (1) the guardians contest the parent's fitness, and (2) the evidence establishes that the parent is unfit, or exceptional circumstances exist to overcome the fit-parent presumption. *Morris*, 2019 Ark. 130, at 10, 572 S.W.3d at 372; *Samples v. Ward*, 2020 Ark. App. 524, at 12, 614 S.W.3d 830, 837.

Daniel has not been previously adjudicated unfit; therefore, he is entitled to the fit-parent presumption. A fit parent seeking termination of a guardianship represents to the circuit court that the guardianship is no longer necessary and that termination is in the child's best interest. *Simmons*, 2023 Ark. App. 386, at 6.

Although the circuit court listed numerous factual findings in support of its unfitness determination, those findings fall into three general categories: (1) disputes concerning the frequency and quality of Daniel's contact with MC; (2) credibility concerns and inconsistent testimony, and (3) financial circumstances and unconventional employment. None of these categories, individually or collectively, establish parental unfitness under Arkansas law.

A parent's limited or imperfect contact with a child does not establish unfitness because fitness turns on the parent's present ability and willingness to care for the child, not the frequency of past contact. *Samples*, 2020 Ark. App. 524, at 12, 614 S.W.3d at 837. Here, the circuit court emphasized periods of no contact, disputed visitation frequency, and the absence of cards or gifts. But the record shows that once Daniel became aware of the guardianship proceedings, he engaged with the Owenses and initially consented to the guardianship for MC's stability. Thereafter, Daniel exercised his court-awarded visitation,

participated in counseling, and reinstated his driver's license. Most significantly, MC's counselor testified she had no concerns regarding Daniel's ability to parent MC and that visitation had gone well.

The circuit court further relied on perceived inconsistencies and Daniel's financial circumstances. Neither establishes parental unfitness. Daniel acknowledged limited income, unconventional business arrangements, and child-support arrearages. However, fitness does not turn on financial compliance in separate proceedings or a parent's economic success. Daniel paid the court-ordered expense for MC's counseling, and nothing in the record showed that MC lacked food, shelter, medical care, or supervision while in Daniel's care. A guardianship is a protective remedy, not a mechanism for economic comparison or lifestyle optimization between households.

The circuit court also noted that Daniel did not always maintain a valid driver's license. While this fact may invite concern, it does not establish unfitness, particularly where Daniel later obtained reinstatement, and no evidence showed that transportation issues placed MC at risk or interfered with Daniel's ability to parent.

This is not a case involving egregious conduct that would call a parent's fitness into question. *See Moore v. Sipes*, 85 Ark. App. 15, 21, 146 S.W.3d 903, 908 (2004). In *Marsh v. Hoff*, this court reversed a circuit court's denial of a relative's petition for guardianship of a minor because there was evidence showing that the father maintained filthy living conditions at his home, the home had no hot water, the child obtained some meals from dumpsters, and the father cohabited with a woman who threatened and cursed the child. 15 Ark. App.

272, 274, 692 S.W.2d 270, 271 (1985). The circumstances here fall short of that level of concern.

Daniel was therefore entitled to the presumption of fitness, and the burden rested on the Owenses to overcome that presumption and prove Daniel's unfitness to parent MC under the circumstances of this case. *Samples*, 2020 Ark. App. 524, at 14, 614 S.W.3d at 838. Although the circuit court is in a unique position to hear the testimony, observe the demeanor of the witnesses, and determine whether the Owenses met their burden of proof, the record does not support its ultimate determination. *Id.* The mere fact that a child may have more or better opportunities with another family is insufficient to deprive an otherwise fit parent of custody. *Simmons*, 2023 Ark. App. 386, at 9. Accordingly, the circuit court's finding that Daniel was unfit is clearly erroneous.

Daniel argues the circuit court clearly erred by finding that exceptional circumstances exist in this case to overcome Daniel's constitutional right to raise MC. Once Daniel sought termination of the guardianship, the burden shifted to the Owenses to prove either parental unfitness or the existence of exceptional circumstances sufficient to overcome the fit-parent presumption. *Simmons*, 2023 Ark. App. 386, at 6. The Arkansas Supreme Court has recognized "that some extraordinary circumstance could potentially overcome even a fit parent's constitutional right to parent his or her child." *Morris*, 2019 Ark. 130, at 10 n.3, 572 S.W.3d at 372 n.3 (quoting *In re W.L.*, 2015 Ark. 289, at 18 n.6, 467 S.W.3d 129, 138 n.6). However, a determination that it would be in the child's best interest for a guardianship to remain in place is insufficient to defeat a fit parent's substantive due process right to raise

11

his or her child. *Id.* at 9, 572 S.W.3d at 371. Here, the circuit court relied on many of the same factors underlying its unfitness determination, including Daniel's historical caregiving role and financial circumstances, MC's counseling needs, and the stability provided by the guardians. These findings largely mirror the same considerations underlying the circuit court's unfitness determination and, for the same reason, do not rise to the level of exceptional circumstances sufficient to rebut the fit-parent presumption.

In *Samples*, this court held that factors such as a child's placement with guardians, limited financial support, and medical needs, were insufficient to constitute exceptional circumstances that would overcome a fit parent's right to custody. 2020 Ark. App. 524, 614 S.W.3d 830.

A parent's historical lack of primary-caregiver status does not establish an exceptional circumstance, nor do disputes regarding the frequency or quality of contact constitute an exceptional circumstance where, as here, Daniel has exercised visitation and complied with court orders. Likewise, Daniel's failure to offer child support under agreed orders that did not require such payments along with financial difficulties, reliance on family members for assistance, and unconventional income arrangements do not constitute exceptional circumstances. MC's participation in counseling similarly does not constitute an exceptional circumstance. It is not unusual for a child experiencing grief and significant life changes to attend counseling, and nothing in the record demonstrates that MC would not continue receiving counseling if the guardianship were terminated. The circuit court also relied on the

guardians' provision of stability in MC's life. However, a guardianship cannot be maintained merely because a third party has been the child's primary caregiver or offers greater stability.

In substance, the circuit court's reliance on these factors reflects a comparative best-interest analysis rather than a finding of truly exceptional circumstances. Accordingly, even if Daniel were deemed a fit parent, the circuit court clearly erred in denying Daniel's petition to terminate the guardianship based on exceptional circumstances. We therefore reverse the circuit court's order denying the petition to terminate the guardianship.

Daniel next argues that the circuit court abused its discretion by ordering him to pay more than half of the attorney ad litem's fees without determining whether the fee request complied with statutory guidelines or assessing the parties' ability to pay. This court reviews a circuit court's award of attorney ad litem fees under an abuse-of-discretion standard. *Mathis v. Hickman*, 2024 Ark. App. 172, at 37, 687 S.W.3d 119, 143. A circuit court may appoint an attorney ad litem when such an appointment would assist in resolving a custody dispute and protect the child's rights. Ark. Code Ann. § 9-13-106(b) (Repl. 2020). When fees and expenses are ordered under the statute, the court must transmit the order to the appropriate office for payment and may require the parties to pay all or a portion of the expenses on the basis of their ability to pay. Ark. Code Ann. § 9-13-106(e)(1)–(2). Attorney ad litem fees are paid from funds appropriated to the Administrative Office of the Courts subject to guidelines establishing maximum hourly rates and allowable expenses. Ark. Code Ann. § 9–13–101(e)(4), (e)(6) (Repl. 2020).

13

Here, $1,250 of the attorney ad litem fees were to be paid from the Administrative Office of the Courts' funds, and the remaining amount of $1,840.06 was assessed to Daniel. The order contains no findings regarding guideline compliance or the basis for allocating the remaining balance to Daniel. *Walchli v. Morris*, 2011 Ark. App. 170, at 9–10, 382 S.W.3d 683, 688. Nor did the circuit court hold a hearing or make a specific determination regarding the ability of both parties to pay. *Id.*

Even absent express findings, a circuit court may properly allocate fees on the basis of a party's financial capacity when that capacity is established in the record. *Mathis*, 2024 Ark. App. 172, at 37, 687 S.W.3d at 143. Here, the circuit court made a finding that Daniel's gross monthly income was $1,905 a month and did not assess the Owenses' income or make specific findings regarding the parties' respective abilities to pay. The record further reflects that Daniel lacks the ability to pay the amount assessed to him. Although Daniel receives financial support from family, this is a fact that weighs against his ability to pay. Despite these circumstances, the court assessed $1,840.06 in attorney ad litem fees against Daniel—an amount constituting nearly his entire gross monthly income without accounting for taxes and other living expenses—and required payment within thirty days.

The circuit court's failure to determine guideline compliance, to make findings regarding the parties' abilities to pay, and to assess Daniel's ability to pay constitutes an abuse of discretion; therefore, the attorney ad litem fees must be reversed and remanded.

Reversed in part; remanded in part.

VIRDEN and HARRISON, JJ., agree.

14

*Taylor & Taylor Law Firm, P.A.*, by: *Tory H. Lewis*, *Andrew M. Taylor*, and *Tasha C. Taylor*, for appellant.

*Tina Adcock-Thomas*, for appellees.