Cite as 2024 Ark. App. 172

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-22-432

| | |
|---|---|
| | **Opinion Delivered** March 6, 2024 |
| JESSICA MATHIS<br>APPELLANT<br><br>V.<br><br>GLEN ALAN HICKMAN, JR.<br>APPELLEE | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SEVENTEENTH DIVISION<br>[NO. 60DR-08-2009]<br><br>HONORABLE MACKIE M. PIERCE, JUDGE<br><br>AFFIRMED IN PART; REVERSED IN PART |

**KENNETH S. HIXSON, Judge**

Appellant Jessica Mathis (Jessica) appeals after the Pulaski County Circuit Court entered several orders in favor of appellee Glen[1] Alan Hickman, Jr. (Alan). On appeal, Jessica contends that (1) the circuit court erred in denying her motions to transfer this case to Rhode Island; (2) the circuit court erred in finding her in contempt regarding Alan's visitation with their minor child (MC) and regarding Alan's telephone communication with MC; (3) the circuit court erred in awarding Alan attorney's fees incurred in Rhode Island; (4) the circuit court erred in calculating support owed and in imputing full-time income to her; and (5) the

---

[1]We note that the record contains two different spellings of appellee's first name throughout.

circuit court erred in its division of attorney ad litem fees. We affirm in part and reverse in part.

## I. *Previous Litigation*

Alan and Jessica were married and have one child together, MC. They were divorced in the Circuit Court of Pulaski County, and on July 28, 2009, an amended order granted Jessica custody of one-year-old MC, subject to Alan's visitation. In addition to visitation, the amended order provided that both parties were to allow reasonable telephone contact with MC while he was in the other's care, which was to "be no less than every night between 7 p.m. and 8:00 p.m." Further, Alan was ordered to pay child support biweekly in the amount of $182.

Subsequent to the divorce, Jessica married Joshua Mathis (Joshua), who was on active duty with the United States Navy. Over the next few years, Joshua was transferred several times. Joshua, Jessica, and MC moved to Hawaii,[2] then to Washington State, and then to Rhode Island. Joshua, Jessica, and MC have resided in Rhode Island continuously since September 2014.[3]

Between 2009 and 2018, despite Jessica's no longer residing in Pulaski County, the parties were frequent participants in a variety of contested custody-related issues in the Pulaski County Circuit Court, to-wit: On December 23, 2009, the circuit court reduced

[2]The record is unclear; however, Jessica and MC may have moved to Hawaii on more than one occasion.

[3]Joshua and Jessica have three children of their own born during their marriage.

2

Alan's child-support obligation to $109 biweekly. On April 28, 2010, the circuit court permitted Jessica to move with MC to Hawaii. On September 18, 2012, Alan was awarded additional visitation, including Christmas, spring break, Thanksgiving, and the summer on certain years; the amount of child support was also modified for Alan to pay $400 biweekly. On December 8, 2014 (by this time, Jessica resided in Rhode Island), child support was again modified, the holiday visitation schedule was again adjusted, and Alan was permitted to call or Skype MC "from 7:00–8:00 p.m. nightly as currently set out to 6:00–7:30 p.m. in the time zone in which the child resides." In this order, Jessica was directed to "take those steps necessary to facilitate such contact without interruption or distraction, and to facilitate the child's calling or videoconferencing [Alan] back as soon as possible following any unavoidably missed call or Skype session." Regarding visitation, the circuit court ordered the following:

> 3. [Jessica] may, following holiday visitation with the minor child for Christmas 2014, obtain the child at 6:00 p.m. on that Friday evening three days before the resumption of school. Thereafter, at [Jessica's] election made at least four weeks before the commencement of any holiday visitation during the school year, to facilitate the return of the child to his home on that day, [Jessica] shall have the child ready for pickup up to three hours earlier than the 6:00 P.M. exchange time two days before the resumption of school recited in the parties' most recent Order, in which event [Jessica] may within two weeks of notification thereof, at his election notify [Alan] that he will be obtaining the child up to three hours earlier to commence visitation, which if not made in that time will result in his obtaining the child at 6:00 p.m. as set out in the most recent Order. [Alan] will deliver the child to the Little Rock Airport for exchange unless [Jessica] agrees to pick him up at the Bryant Lowe's. [Alan] will pick the child up at his school if he elects to get him at 3:00 p.m. otherwise [Jessica] will deliver the child to the Providence Airport by 6:00 p.m. or hotel near the Providence airport if requested by Plaintiff.

4. In view of the addition of a winter break in the child's new school system, the parties' existing holiday visitation shall be adjusted so that [Alan] continues to receive Christmas Break (as defined in earlier Orders) starting on even-numbered calendar years, and the spring break in odd-numbered years, and alternating winter break so that [Alan] receives it in even numbered years.

The parties were back in court, and on October 1, 2015, the circuit court modified Alan's child support and ordered that he pay $555 biweekly. The circuit court recognized that there would be additional moves likely because of Joshua's service in the military. The circuit court recognized that there had been problems regarding Alan's ability to communicate with MC while he was in Jessica's custody and noted the following:

9. With respect to phone calls, the Court does find there have been problems for Mr. Hickman in making contact via phone. The Court is concerned with that and wants any problems with phone calls stopped. If the phone call problems continue, the Court will deal with it in a drastic fashion. The Court would point out that the presences of the two other children in [Jessica's] home are not a concern of the Court because they are not before this Court. [Jessica] is to exercise her best effort to allow phone contact. For example, if the child is in a restaurant and a phone call is placed to him by Mr. Hickman it is reasonable to have the phone call returned after leaving the restaurant. If he is in a car returning from boy scouts or some other activity he should be allowed to return the phone call. Mr. Hickman needs to realize that a child that is approximately 7 years of age is not generally going to speak for a long period of time.

10. [Jessica] will allow [MC] to call [Alan] at any reasonable time he wants to. Further, [Jessica] is to foster communication between [MC] and [Alan]. The parties are to be reasonable about phone call times and length of calls. Further it is the Court's desire that the parties use FaceTime or Skype whenever possible. The Court reiterates that the continued problems with the calls may lead to further action by the Court that will be severe.

11. The Court finds that a majority of the time [Jessica] never answered the phone when [Alan] called. That has to stop. The Court will not have any patience with the problem in the future.

4

12. The Court is going to modify its previous Orders regarding the time for phone contact. In the Court's view it is not reasonable to call at 7:45 a.m. when the person is trying to get out of the door to school. It is not reasonable to call at 10:00 p.m. if you know he goes to bed at 8:00 p.m. The Court stresses that it is [Jessica's] obligation that if the call did not go through because the child was down the street playing or some other reason he was unavailable that she has the obligation to replace the call as soon as possible and generally that means that day.

And, finally, the parties returned to court, and on September 13, 2018, Alan's child support was set at $554 biweekly. That takes us up to the present litigation, which was initiated by Jessica in Rhode Island on or about March 13, 2019.

## II. *Current Litigation*

There was a lull in the litigation between the parties for approximately six months. On March 13, 2019, Jessica filed an emergency ex parte motion to temporarily suspend visitation *in the state family court of Rhode Island*, allegedly pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). Jessica alleged that MC did not desire to return to visit Alan in Arkansas. In support, Jessica submitted a signed thirty-seven-paragraph affidavit and therein alleged, inter alia, that MC had been "exposed to domestic violence in the home by [Alan] towards [Jessica] *prior* to their divorce," that MC had witnessed Alan "punch a hole in the wall while exhibiting his anger towards his step-sister," and that Alan does not take enough time off work and spend enough time with MC during his visitations." (Emphasis added.) Of particular note, despite the history of at least six modifications as outlined above, Jessica also stated in an affidavit to family court in Rhode Island, "That to the best of my knowledge, said Amended Order of Divorce has not been amended or modified since July 27, 2009."

5

Alan obtained counsel in Rhode Island and moved to dismiss. Nine days after Jessica filed her ex parte motion in Rhode Island, Alan filed a motion for contempt in the Pulaski County Circuit Court on March 22, 2019. Alan alleged that Jessica was interfering with his communication with MC in direct contravention of the circuit court's 2015 order. Jessica responded and asked that the motion be denied and dismissed.

Jessica subsequently filed a motion in the Pulaski County Circuit Court to change venue and jurisdiction from Pulaski County to Rhode Island pursuant to the UCCJEA. She alleged that Rhode Island is MC's home state and the proper state to determine any custody and visitation issues. Jessica went on to explain that her husband is in the military, that she intended to remain in Rhode Island, and that any witnesses and telephone records were either located in or originated in Rhode Island. She additionally alleged that the motion for contempt was "groundless" and attached approximately one hundred pages of telephone records that she argued disproved the basis of Alan's contempt motion. Alan filed his response, asking the Arkansas circuit court to deny Jessica's motion alleging that the Pulaski County Circuit Court has exclusive continuing jurisdiction, MC has a substantial connection with Arkansas by coming to visit Alan on a regular basis, and the Pulaski County Circuit Court is familiar with the case.

At some point, the Rhode Island judge and the Pulaski County Circuit Court judge conferred by telephone concerning the proper forum for the current dispute between the parties. After a hearing held on April 11, 2019, the Rhode Island court filed a written order dismissing Jessica's ex parte petition "after conference with counsel for the parties and review

6

of the papers, as well as the Court's telephone conference thereafter with Judge Pierce of the

Arkansas Court." The Rhode Island order specifically found the following:

    1.  [Alan's] Motion to Dismiss is GRANTED.

    2.  The State of Arkansas shall continue to exercise exclusive continuing jurisdiction pursuant to G.I. § 15-14.1-15 so long as [Alan] resides in the State of Arkansas.

    3.  The Arkansas Court will address the concerns raised by the parties in this matter, including [Jessica's] request to suspend visitation, and [Alan's] objection thereto, and the issue of any makeup parenting time owed to the [Alan] as a result of the instant litigation.

This order ended the Rhode Island litigation.

Back in Arkansas, on April 16, 2019, Alan filed a motion for an "Emergency Order

to Enforce Visitation" or, alternatively, a request for an emergency hearing in the Pulaski

County Circuit Court. Alan alleged that he was scheduled to pick up MC in Rhode Island

on April 12, 2019, for his spring break visitation. However, Jessica filed the action in Rhode

Island. After the hearing on April 11, 2019, in which the Rhode Island court indicated that

it was dismissing that action, Alan sent Jessica a text message stating that he needed to know

if Jessica "planned on allowing [him] visitation for [MC's] spring break." Jessica never

responded. Instead, Joshua responded and stated, "[P]lease direct your legal question to

[Alan's Rhode Island attorney]." Alan texted, "So you're telling me that I have to go through

an attorney to get visitation with my son since your case in Rhode Island has now been

dismissed, is that where we stand?" Alan attached screen shots of these text messages to his

motion. Jessica responded to the motion, arguing that she directed Alan to contact his

Rhode Island counsel on the advice of counsel and that she nevertheless had a plane ticket in place for MC's return trip.

Jessica subsequently filed a counterclaim on April 30, 2019, seeking to amend MC's summer visitation schedule with Alan. She sought to reduce Alan's visitation because MC was unable to participate in certain activities in Rhode Island, MC was upset that he does not have his own room when he visits Arkansas, Alan's wife had gambled while on a family vacation and stayed in a different hotel than MC, and Alan had subjected MC to "psychological terror" in insisting that MC ride certain amusement rides. Jessica also filed a motion for immediate temporary relief, repeating the same concerns that were expressed in her counterclaim. Alan filed responses to Jessica's counterclaim and motion and asked that both be denied.

This flurry of pleadings led to Alan to file his own petition for modification of custody on May 20, 2019. He alleged that Jessica had continued to interfere with his visitation and limited his telephone contact with MC. He explained that Jessica had insisted that MC end his calls within minutes, told MC what to say during the calls, ran electronics in the background to make it difficult for him to hear MC, or created other distractions. Regarding visitation, Alan explained that Jessica had made continual efforts to shorten his visitation time and "pursued litigation in an attempt to disrupt and sabotage [Alan's] visitation and relationship with [MC]." Alan also stated that he believed Jessica was making negative comments about him to MC and was attempting to influence MC's behavior toward him. As such, he requested that he be granted primary custody and that Jessica pay reasonable

8

child support. Jessica generally denied these allegations and asked the circuit court to deny Alan's petition.

Alan followed up his petition to modify custody with an amended motion for contempt on June 13, 2019. In the amended motion for contempt, Alan alleged that Jessica should be held in contempt "for her continual interference with [Alan's] telephone visitation; for her continual interference with [Alan's] visitation; specifically, [Alan's] Spring Break visitation; and for her failure to not inform [Alan] that the minor child was enrolled in counseling." Jessica responded and generally denied the allegations and asked that Alan's motion be denied.

Jessica filed a motion for appointment of an attorney ad litem (AAL). Alan requested that the motion be denied or, alternatively, that Jessica be solely responsible for the cost of an AAL. On July 2, 2019, the circuit court ordered that an AAL be appointed. The circuit court ordered both parties to directly pay the AAL a $500 retainer. The circuit court further determined that pending any approval of the Administrative Office of the Courts (AOC) to pay any AAL fees, the AAL would bill at the rate of $150 an hour and submit any bill to the parties to be divided pending any further determination of the court. The circuit court explicitly reserved "the right to allocate payment of the entire attorney ad litem fee between the parties at the final determination." The circuit court additionally added that it was reserving the right to order that the AAL be paid at the rate promulgated by the AOC should the parties qualify for the approval of AOC funds.

A few days later, on July 16, 2019, Jessica filed yet another motion in the circuit court; this time, she filed a motion for an increase in child support. She claimed that Alan's affidavit of financial means did not include his gambling winnings. Alan responded with a motion to dismiss or, in the alternative, a response to Jessica's motion, generally denying that Jessica was entitled to an increase in child support. Jessica amended her motion for an increase in child support on August 7, 2019, and realleged that she was entitled to an increase in child support, which Alan denied in his response.

Alan then filed a motion for holiday visitation on November 11, 2019, requesting that he be permitted to have visitation with MC during Christmas break; and he filed an amended petition for change of custody on November 21, 2019, repeating many of the same allegations as before. Jessica responded to both motions and asked that they be denied.

Eventually, Alan filed a motion to reduce child support on May 4, 2020, after his hours at work had been reduced through no fault of his own.[4] Jessica timely filed her response in which she requested that the circuit court grant her previous motion to increase child support and make it retroactive prior to any reduction being granted.

A year passed, and on June 8, 2021, despite the fact that the Rhode Island family court had previously dismissed her motion for ex parte relief two years earlier, Jessica filed a motion to transfer the entire case to Rhode Island. She argued that Rhode Island was the

---

[4]Although there were multiple other motions filed during the pendency of this case, including discovery motions, we need not discuss these motions since they are irrelevant to the issues in this appeal.

10

appropriate forum to determine any motion for change of custody because MC had lived in Rhode Island since September 2014, the chance that she and her husband would move from Rhode Island is slight, almost all relevant witnesses would be located in Rhode Island, and any information would be more readily available to the courts in Rhode Island. Alan disagreed in his response and argued that the circuit court had continuing jurisdiction over this case pursuant to Arkansas Code Annotated section 9-19-202. He further argued that the Pulaski County Circuit Court had years of knowledge of this case and was "best-suited to continue to preside over this case."

On October 18, 2021, the circuit court entered a pretrial order. The circuit court noted that Alan had withdrawn his motion for change of custody on the record on June 21, 2021, and that it was therefore dismissed. The circuit court additionally ruled that several motions from both parties (mostly regarding discovery issues) were "moot and therefore denied" and that only the specifically listed motions and pleadings would be heard at the final hearing. A hearing on those remaining pleadings and motions was held on October 28–29, 2021. During this lengthy hearing, the following relevant evidence regarding Jessica's points on appeal was presented.

Jessica testified at length. Jessica was questioned about her decision to file proceedings in Rhode Island. She admitted she signed an affidavit for those proceedings stating that the amended order of divorce had "not been amended or modified since July 27, 2009." She explained that she filed everything through the advice of her counsel in Rhode Island. Jessica acknowledged that multiple orders had been filed in Arkansas since

11

the 2009 amended order of divorce. However, she stated that she did not know those orders were considered amendments of the amended order of divorce. Rather, Jessica said that she thought they were "just amendments of . . . visitation and that sort of thing." She also acknowledged that the Rhode Island proceedings were dismissed after the circuit court in Arkansas retained jurisdiction.

Regarding the visitation Alan was supposed have with MC during spring break of 2019, Jessica admitted that the Rhode Island case had been dismissed the day before spring break, that Alan had messaged her to exercise his visitation, and that her husband messaged Alan to contact his attorney in response to that message. That said, Jessica did not agree that she prevented Alan from exercising his visitation. Instead, she blamed Alan for not providing her details about when he was picking MC up from Rhode Island, even though she refused to respond to his text messages. Jessica did offer during the hearing to allow the missed visitation to be made up later that year during Christmas break from December 26, 2021, through January 2, 2022.

Regarding the court-ordered phone communication between Alan and MC, Jessica denied that she had ever intentionally interfered with the phone calls. She claimed that she did not run the vacuum while MC was talking on the phone or tell MC what to say. Jessica testified that she did not recall making MC place the call on speaker phone, hanging up the phone while the two were talking, or telling MC's friends that MC cannot play because he has to talk to Alan. She did admit that she refused to share the passcode to the cell phone she provided to MC to use while he was in Alan's care.

The testimony revealed that shortly before she filed the ex parte motion in Rhode Island, unbeknownst to Alan, Jessica took MC to counseling sessions with a therapist. Regarding MC's counseling, Jessica admitted that she took MC for counseling on March 12, 2018. The initial intake reports from the therapist indicated that Alan had not been a part of MC's life during the child's first three years of life. On cross-examination, Jessica denied that she told the counselor during intake that Alan had not been part of MC's life for the first three years, even though the intake form indicated such. Jessica agreed that the statement was false. Although she initially claimed that she had informed Alan about the counseling, she was shown an email she had sent to Alan about the counseling that was sent after the first official session had already taken place. She also admitted that she did not inform Alan that MC was meeting with someone from the Fleet and Family Advocacy Program, which is generally a program within the United States Navy for family assistance.

Jessica admitted she is aware that Alan and his current wife, Betsy Hickman, have a guardianship over another child. Jessica admitted she had contacted the parents of that child and also Betsy's ex-husband in an attempt to either discover negative evidence about Alan or to otherwise question Alan's parenting skills. Jessica had also contacted the Benton Police Department to "ask questions about the concerns that were pending," even though MC had been in Rhode Island at the time. Jessica said that she asked the police department what the "protocol be" when MC did not have his own bed at Alan's home in Benton. When asked why she denied in her interrogatories that she had contacted the police department, Jessica explained that she thought the question was whether she had filed a police report. While

13

she admitted she had contacted the police department, Jessica denied having filed a police report.

Jessica testified that the last time she worked was in 2010, when she worked full time as a sales representative for the Hershey Company, making "close to" $40,000 to a year.

Joshua testified that he had recently retired from the United States Navy and was not working at that time. He explained that in addition to MC, he and Jessica have three children together, ages ten, almost seven, and four. He said that the four-year-old and ten-year-old have special needs. He explained that it was helpful to have Jessica remain a stay-at-home mother because he was more "marketable" with her doing so. On cross-examination, Joshua admitted he would not have contacted Betsy's ex-husband as Jessica had.

Betsy Hickman, Alan's wife, testified that her fourteen-year-old daughter and a seventeen-year-old girl that both she and Alan have a guardianship over live in the home. Betsy confirmed that Alan has had many issues with phone communication and visitation with MC. She testified that the communication had improved since Alan filed the recent motion for contempt. She opined that Alan has a "positive influence" on MC's life and that Alan cherishes the time he has with his son. Betsy stated that Jessica had been harassing her by contacting the parents of the young girl she and Alan have a guardianship over, her ex-husband, and the Benton Police Department. Although she admitted that MC did share a room with the girls at one point while he was visiting, she explained that he "has always had his own bed." She also explained that he has had his own bedroom since 2018.

14

One of the issues before the court was the countering petitions to increase or decrease child support. To calculate child support, Alan asked that the circuit court impute $60,000 in annual income to Jessica. He explained that the last year they were married in 2009, Jessica made well over $50,000 working for the Hershey Company.

Regarding his motion for contempt, Alan reiterated that he missed his spring break visitation with MC in 2019. He explained that even after the Rhode Island litigation was dismissed, Jessica still did not allow MC to exercise his spring break visitation. As a sanction, he asked that he be awarded $6,319.60 for attorney's fees he incurred in Rhode Island and asked that he be allowed to make up that missed time with his son. He was willing to accept the time (an extra week during the upcoming Christmas break) Jessica offered during her testimony. Regarding his other allegations of contempt, Alan testified that Jessica did not inform him about counseling beforehand. He also refuted the records that indicated the counselor believed he had not been a part of MC's life for the first three years. He asked the circuit court to order that MC's records be corrected because he thought this misinformation was detrimental. Alan further testified that he has had trouble maintaining contact with MC. He described instances in which he would call and text with no responses, Jessica would be running the vacuum cleaner next to the phone, there would be other children screaming in the background, and Jessica would hang up the phone during the conversation. Alan admitted that some of his communication with MC had gotten better since he filed the motion for contempt. Alan opined that Jessica contacted Betsy's ex-husband, the parents of the young girl he and Betsy have a guardianship over, and others in an attempt to reduce the

15

time he has with MC. Alan stated that he felt like he has "a stalker from afar." Finally, Alan asked that Jessica be responsible for paying his attorney's fees in this case in addition to the attorney's fees he incurred in Rhode Island.

Kathleen Clarkson, MC's therapist in Rhode Island, testified through a deposition that was read into the record at the hearing. She testified that MC had anxiety issues but that there had "been a tremendous improvement." She opined that MC has a good relationship with Alan.[5]

At the conclusion of the October 28 hearing, the circuit court orally announced that it was not transferring the case to Rhode Island. On December 8, 2021, the circuit court advised the parties by letter that it found Jessica had "wrongfully withheld Spring Break visitation . . . during 2019, even after Rhode Island declined to take jurisdiction." Accordingly, the circuit court ordered Jessica to allow Alan visitation with MC the second half of Christmas in 2021 as a makeup period and that Jessica would also be responsible for all travel costs. The court's letter also directed the parties to provide calculations for income and child support pursuant to Administrative Order No. 10 and advised that it would make further findings regarding the remaining outstanding issues thereafter.

Each party provided the circuit court with its own calculations of child support. The circuit court held a hearing via Zoom on January 13, 2022, during which it announced its

---

[5]There is voluminous testimony and documents not summarized herein that are not necessary for the disposition of this appeal.

16

detailed rulings on the various outstanding issues. At the conclusion of the hearing, the court asked Alan's counsel to prepare a proposed order, which is detailed below.

Alan's attorney submitted a proposed order as requested by the court. Not surprisingly, Jessica's attorney did not approve the order, and each party filed another flurry of motions. Eventually, on March 18, 2022, the circuit court filed its lengthy final order from the October 28–29, 2021, hearing in which it made the following pertinent findings:

1. Jurisdiction and venue are proper herein.

2. The Court finds that due to the voluminous pleadings and hearings in this matter since its inception, no other court would have more knowledge of the facts and history of this matter than the present court. Mother's Motion to Change Venue filed on April 30, 2019 is denied. Mother's Motion to Transfer Case filed on June 8, 2021 is denied. Her motions to move this case to Rhode Island are without any merit or basis. The Court finds that Mother committed perjury in her affidavit to Rhode Island.[6]

3. The Court has considered the recommendations of the attorney ad litem and the Court's rulings herein are in line with those recommendations and are in the best interest of the minor child.

4. Father's Motion for Emergency Order to Enforce Visitation filed April 16, 2019 and Father's Motion for Holiday Visitation filed November 11, 2019 are granted as set forth herein. The Court issued a partial letter opinion on December 8, 2021 which found that Mother wrongfully withheld Spring Break visitation from Father during 2019. During trial, Mother offered and Father accepted the second half of the 2021 Christmas vacation as a makeup period which is the order of the Court. The Court found that Mother shall pay the entire travel cost for the child when Father exercises his Christmas visitation in 2021. The Court reserved further rulings in its December 8, 2021 partial ruling letter.

5. Father's Motion for Contempt filed March 22, 2019 and Father's Amended Motion for Contempt filed June 13, 2019 are granted as set forth herein. The Court

_____

[6]The court did not further elucidate on its finding that Jessica committed perjury in her affidavit in Rhode Island.

17

finds that Mother willfully violated the Court's orders by interfering with Father's telephone communication with the minor child. The Court finds that Mother willfully violated the Court's orders by continuingly interfering with Father's visitation.

6. Mother is found in willful contempt for continuingly interfering with Father's custody and visitation. She willfully denied him his 2019 Spring Break visitation. *She willfully violated the Court's orders by filing actions in Rhode Island in an effort to interfere with his custody and visitation and to harass Father.* She has interfered and/or attempted to interfere with Father's visitation by contacting the parent(s) of the two children living in Father's home.

7. Mother further interfered or attempted to interfere with Father's visitation by harassing him by contacting the Benton Police Department. The Court found the stepfather to be credible. Stepfather testified he did not think it was a good idea that Mother had contacted the parent(s) of the children over whom Plaintiff and his wife have guardianship. Mother's harassment of Father is a violation of the Court's orders regarding no harassment and her harassment is an attempt to interfere with Father's visitation.

8. Mother has interfered and continues to interfere with Father's visitation and communication and contact with the child. She has interfered with Father's phone communication with the child despite previous Court orders that warned her against the same. Specifically, the Court's 2015 Order states "there have been problems for Father in making contact via phone . . . if the phone call problems continue, the Court will deal with it in a drastic fashion . . . Mother is to exercise her best effort to allow phone contact . . . Mother is to foster communication between the child and Father . . . the Court reiterates that the continued problems with the calls may lead to further action by the Court that will be severe."

9. Mother shall reimburse Father for his Rhode Island attorney fees in the amount of $6,319.60 within 180 days of entry of this order.

10. Mother is sanctioned by ten days in the Pulaski County Jail which ten days are suspended and conditioned on her not violating any court order of this Court in the future until such time as the Court loses jurisdiction over the child. Should the Court find Mother in contempt in the future the Court will sanction her appropriately for that contempt and enforce the ten days which are currently suspended. The Court takes this action based upon the present violations and a complete review of this case and the ongoing problems with Mother in this case.

11. Father's Petition for Modification of Custody filed May 20, 2019/First Amended Petition for Modification of Custody filed November 21, 2019 are moot as to change of custody as Father did not move forward on these motions as to custody. Father did request relief as to issues of phone communication, travel issues and specifications on visitation days/exchanges which are granted as set forth herein.

. . . .

19. The minor child may miss classes on Fridays for travel to see Father unless he has a test or project that he cannot miss or he has a low grade in a class he would miss and the absence would negatively affect his grade. If this provision becomes an issue either party may petition the court for relief regarding the same.

20. Upon reasonable notice to Mother, Father may go to Rhode Island to see the child for additional visitation, and the Court encourages Father to do so.

21. The parties shall take into consideration the travel time and airfare and communicate with one another as to which airport the child should fly out of when deciding between Providence or Boston, including potential additional time considerations for traveling in or through Boston.

. . . .

24. Mother's Counterclaim to Modify Summer visitation filed on April 30, 2019 is denied. Father's summer visitation with the minor child shall not be modified. The Court finds that the minor child cannot have it all because of the parties' divorce and distance. He is a stellar child. The Court has no concerns with either parent's home. Father has a limited amount of time with the minor child. It is necessary for the minor child to have time with Father to continue a viable father/son relationship. The Court finds it is not in the child's best interests for Father's time to be reduced or modified. The Court considered the football coach's deposition which was introduced as Joint Exhibit 1. The Court finds that the child can play football for the school, but he will just have to start later in the year.

25. The Court will not modify Father's schedule for the child to attend Boy Scouts. Father and the minor child can discuss the details and Father can determine if he is able and willing to modify his time to accommodate the camp.

26. Mother shall not offer up activities for the child to participate in during Father's time before discussing the same with Father. She will not make Father the bad guy by telling the child about a camp or event before clearing it with Father. If

19

Father says no and the child already knows about it and wants to go it is not a winnable situation for Father.

27. Mother's Motion for Immediate Temporary Relief filed on May 8, 2019 is denied.

. . . .

30. The parties shall equally divide the cost of the child's travel between Rhode Island and Arkansas.

31. Mother's Motions to Increase Child Support filed July 16, 2019/Amended Motion to Increase Child Support filed August 7, 2019 are denied as to an increase in child support but granted as to modification as set forth herein. Father's Motion to Reduce Child Support filed May 4, 2020 is granted as set forth herein.

32. The Court finds that there has been a material change in income that warrants a modification in child support. The Court's child support calculations and worksheet are attached hereto and incorporated by reference herein as Exhibit A.

    a. The Court imputes gross monthly income to Mother in the amount of $20.00 per hour on a forty-hour work week which equates to $3,467.20 per month. The Court denies Mother's request to impute income to her for part-time work rather than full-time work. There is a rebuttable presumption that the payor and the payee can work full-time or earn full-time income. The Court finds Mother did not overcome this presumption. The Court is not required to consider the presence of young children or disabled children who must be cared for by the parent as being a reason why a parent is unable to work. The Court considered the specific circumstances of both parents, including the parents' assets, residence, employment and earnings history, job skills, educational attainment, literacy, age, health, criminal record and other employment barriers, Defendant's record of seeking work as well as the local job market and Rhode Island minimum wage which is $12.25 as of January 1, 2022. The Court considered the testimony of the parties as to Mother's earning capabilities.

    b. The Court finds that Father received a raise on November 19, 2021, after the trial in this matter, but prior to the ruling and informed the Court of the same. Therefore, there will be separate child support calculations until November 19, 2021 and after November 19, 2021.

20

c. The Court finds that prior to November 19, 2021 Father's gross monthly income from all sources was $10,982.36 ($63.35/hour at 40 hours a week).

d. The Court finds that as of November 19, 2021–present Father's gross monthly income from all sources is $11,339.48 ($65.41/ hour at 40 hours a week).

e. The Court denies Father's request for a deviation for summer abatement.

f. The Court denies Father's request for a deviation for travel expense since the parties are now equally dividing this cost.

g. The Court denies Father's request for a deviation for federal taxes paid through Father's bankruptcy plan.

h. The Court denies Mother's request to impute rental income to Father and Father's request to deviate the depreciation on the alleged rental income.

i. The Court denies [Mother's] request to add gambling winnings as additional income to Father since [Father's] Exhibit 21 shows an overall loss and even if there had been winnings, Father's losses should be considered as well.

j. The Court finds that the modification in child support is retroactive to July 16, 2019 the date of Mother's Motion to Increase Child Support (although Father's child support obligation is actually going to decrease.)

k. The Court finds that Father's child support obligation to Mother was $1,035.68 per month from July 16, 2019–November 18, 2021.

l. The Court finds that Father's child support obligation to Mother from November 19, 2021–present is $1,058.34 per month.

m. The Court finds Father has an overpayment of child support credit from July 16, 2019–November 18, 2021 in the amount of $1968.96.

n. The Court finds Father has an overpayment of child support credit from November 19, 2021–January 31, 2022 in the amount of $142.98.

o. The overpayment credit of $2111.94 shall be pro-rated until the child ages out in the amount of $40.61 per month. Therefore, Father's child support to Mother shall be $1017.73 per month effective February 1, 2022 until May 1, 2026.

. . . .

21

34. The attorney ad litem shall submit a fee petition and a proposed order with a blank for each parent's allocated portion.

35. *As previously stated, Father is awarded his Rhode Island attorneys' fees in the amount of $6,319.60 which shall be paid within 180 days of entry of this order. Father is the prevailing party, and the Court has inherent authority to award fees. Therefore, Father's Arkansas counsel shall file a petition for fees.*

(Emphasis added.) Jessica timely appealed, and Jessica abandoned any pending but unresolved claims in her notice of appeal.[7]

III. *Motion to Transfer from Pulaski County to Rhode Island*

Jessica first contends that the circuit court erred in denying her motions to transfer this case to Rhode Island. (The term "circuit court" as used herein refers to the Circuit Court of Pulaski County, Arkansas.) The UCCJEA, as codified at Arkansas Code Annotated sections 9-19-101 et seq. (Repl. 2020), is the exclusive method for determining the proper state for jurisdictional purposes in proceedings involving matters of child custody that

_____

[7]In her second amended notice of appeal, Jessica purports to appeal from two additional orders that were filed after the court's March 18, 2022, order on the merits. First, Jessica stated that she "appeals from the denial of her Rule 60 motion by operation of law." It is true that Jessica filed a motion pursuant to Arkansas Rule of Civil Procedure 60 on June 8, 2022. However, the June 8, 2022, motion was not filed within ten days of the March 18, 2022, final order; therefore, contrary to Jessica's assertion, it was not deemed denied by operation of law because Rule 60 contains no deemed-denied provision. Further, Rule 4(b)(1) of the Arkansas Rules of Appellate Procedure–Civil would apply only if the motion had been filed within ten days. *See Dale v. White*, 2018 Ark. App. 172, 545 S.W.3d 812. Accordingly, there is no ruling by the circuit court on this motion from which to appeal. *Id.*

Second, Jessica stated that she "appeals from the Circuit Court's September 13, 2022 Order awarding attorney's fees to [Alan]." However, our appellate record does not include an order filed on September 13, 2022, and Jessica's appellate brief does not address these attorney's fees. As such, we do not address the issue of whether the circuit court erred in awarding attorney's fees in its September 13, 2022, order.

involve other jurisdictions. *Doughty v. Douglas*, 2017 Ark. App. 445, 527 S.W.3d 732. Our standard of review in a case involving the UCCJEA is de novo, although we will not reverse the circuit court's findings of fact unless they are clearly erroneous. *Id.* Once a circuit court determines that it has jurisdiction pursuant to the UCCJEA, it has the discretion to decide whether to decline to exercise jurisdiction, and we will not reverse the court's decision on that matter absent an abuse of that discretion. *Id.*

Once an Arkansas circuit court enters the initial divorce decree and award of custody, the court has exclusive, continuing jurisdiction over the child-custody determination until it makes either of the two determinations set forth in Arkansas Code Annotated section 9-19-202(a). In order to lose jurisdiction, the circuit court must find that "(1) . . . neither the child, nor the child and one (1) parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships *or* (2) the child, the child's parents, and any person acting as a parent do not presently reside in this state." Ark. Code Ann. § 9-19-202(a)(1) & (2) (emphasis added); *see Harris v. Harris*, 2010 Ark. App. 160, 379 S.W.3d 8. The Arkansas court in the present case initially awarded child custody in 2009 when it entered the divorce decree, thus giving the court exclusive, continuing jurisdiction over the custody determination until the Arkansas court made either of the two determinations set forth in section 9-19-202(a). *Id.* In the present litigation, the circuit court did not find that Jessica proved either 202(a) determination; therefore, the Pulaski County Circuit Court continued to have exclusive and continuing jurisdiction.

23

Jessica does not appear to contest that the circuit court retained exclusive, continuing jurisdiction under section 9-19-202(a). Instead, she argues that the circuit court should have granted her motion and declined to exercise its jurisdiction under Arkansas Code Annotated section 9-19-207(a) because Arkansas is an inconvenient forum. Section 9-19-207 provides the following in pertinent part:

(a) A court of this state which has jurisdiction under this chapter to make a child-custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum. The issue of inconvenient forum may be raised upon motion of a party, the court's own motion, or request of another court.

(b) Before determining whether it is an inconvenient forum, a court of this state shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all relevant factors, including:

(1) whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;

(2) the length of time the child has resided outside this state;

(3) the distance between the court in this state and the court in the state that would assume jurisdiction;

(4) the relative financial circumstances of the parties;

(5) any agreement of the parties as to which state should assume jurisdiction;

(6) the nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

(7) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and

(8) the familiarity of the court of each state with the facts and issues in the pending litigation.

24

Thus, under section 9-19-207, a court may refuse jurisdiction under the UCCJEA if it considers itself an inconvenient forum and finds that another state is the more appropriate forum. *Lowder v. Gregory*, 2014 Ark. App. 704, 451 S.W.3d 220. However, if a court chooses to retain jurisdiction, we will not reverse that decision absent an abuse of discretion. *Id.*

Jessica argues that the circuit court considered only the last factor because it was the only factor discussed in the circuit court's order, and the other factors enumerated under the statute weighed in favor of transferring the case to Rhode Island. Jessica further disputes that the circuit court had any specialized familiarity with the case. We disagree.

Just because the circuit court did not grant her motion and discussed only the factor to which it gave the most weight does not mean the circuit court did not consider all the other factors in its decision. In the absence of a statute or rule requiring specific findings of fact or a timely request for specific findings under Ark. R. Civ. P. 52, we will ordinarily presume that the circuit court made the findings necessary to support its judgment. *Grayson v. Anderson*, 2023 Ark. App. 428, at 8, 675 S.W.3d 900, 905; *Skinner v. Shaw*, 2020 Ark. App. 407, at 12, 609 S.W.3d 454, 461. Here, the statute does not require a court to provide written findings as to each factor; nor does the statute require that each factor be weighed equally.

Here, it is clear that Alan has remained in Arkansas, MC continues to travel to Arkansas for visitation with Alan, and the circuit court has had familiarity with this case since 2009 when it initially awarded custody and continued to exercise its jurisdiction in

25

multiple orders modifying that decree over the years. The facts of this case are similar to those in *Uttley v. Bobo*, 97 Ark. App. 15, 242 S.W.3d 638 (2006). In *Uttley*, we similarly affirmed a circuit court's decision to retain jurisdiction after considering Arkansas Code Annotated section 9-19-207 where the father remained in Arkansas, the children continued to travel to Arkansas for visitation, and the Arkansas court was familiar with this case because the parties had been before it since the divorce litigation began sometime prior to entry of the divorce decree on June 27, 2000. We therefore see no abuse of discretion in the court's continuing its jurisdiction and affirm this point.

## IV. *Contempt*

Jessica argues that the court erred in finding her in contempt (1) for interfering with the communication between Alan and MC and visitation; and (2) for filing the ex parte motion in Rhode Island family court. We address these arguments separately.

### A. Contempt for Interference with Communication and Visitation

Jessica contends that the circuit court erred in finding her in contempt for interfering with both Alan's visitation with MC and Alan's telephone communication with MC. Our standard of review for civil contempt is whether the finding of the circuit court is clearly against the preponderance of the evidence. *Omni Holding & Dev. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 156 S.W.3d 228 (2004). In order to establish civil contempt, there must be willful disobedience of a valid order of a court. *Applegate v. Applegate*, 101 Ark. App. 289, 275 S.W.3d 682 (2008). However, before one can be held in contempt for violating the circuit

26

court's order, the order must be definite in its terms and clear as to what duties it imposes. *Id.*

Here, the circuit court granted Alan's motion and amended motion for contempt for multiple reasons. It found that Jessica had "willfully violated the Court's orders by interfering with Father's telephone communication with the minor child" and that Jessica had "willfully violated the Court's orders by continuingly interfering with Father's visitation." In support of these findings, the circuit court more specifically found that Jessica had "willfully denied [Alan] his 2019 Spring Break visitation"; had "interfered and/or attempted to interfere with Father's visitation by contacting the parent(s) of the two children living in Father's home"; had "interfered or attempted to interfere with Father's visitation by harassing him by contacting the Benton Police Department"; and had "interfered with Father's phone communication with the child despite previous Court orders that warned her against the same." Jessica argues that none of these findings are supported by the evidence to hold her in contempt.[8] We disagree that the evidence is insufficient to support the circuit court's contempt finding.

Before Jessica could be held in contempt for violating the circuit court's order, the order must be definite in its terms and clear as to what duties it imposes. Here, the circuit

---

[8]To the extent Jessica expands her argument—including a due-process argument—for the first time in her reply brief, this argument comes too late. Unless an appellant files an opening brief that states all the arguments for reversal, an appellee has no opportunity to respond to those arguments in writing, and it is well established that we will not consider an argument made for the first time in a reply brief. *Mattox v. Main Entrance, Inc.*, 2021 Ark. App. 382; *Fennell v. City of Pine Bluff*, 2016 Ark. App. 275, 492 S.W.3d 887.

court filed two orders that are particularly relevant. In its December 8, 2014, order, the circuit court ordered that Alan was permitted to call or Skype MC "from 7:00–8:00 p.m. nightly as currently set out to 6:00–7:30 p.m. in the time zone in which the child resides." Jessica was directed to "take those steps necessary to facilitate such contact without interruption or distraction, and to facilitate the child's calling or videoconferencing [Alan] back as soon as possible following any unavoidably missed call or Skype session." Regarding visitation, the circuit court ordered, "4. In view of the addition of a winter break in the child's new school system, the parties' existing holiday visitation shall be adjusted so that [Alan] continues to receive Christmas Break (as defined in earlier Orders) starting on even-numbered calendar years, and the spring break in odd-numbered years, and alternating winter break so that [Alan] receives it in even numbered years." In its October 1, 2015, order, the circuit court included the following directives:

> 9. With respect to phone calls, the Court does find there have been problems for Mr. Hickman in making contact via phone. The Court is concerned with that and wants any problems with phone calls stopped. If the phone call problems continue, the Court will deal with it in a drastic fashion. The Court would point out that the presences of the two other children in [Jessica's] home are not a concern of the Court because they are not before this Court. [Jessica] is to exercise her best effort to allow phone contact. For example, if the child is in a restaurant and a phone call is placed to him by Mr. Hickman it is reasonable to have the phone call returned after leaving the restaurant. If he is in a car returning from boy scouts of some other activity he should be allowed to return the phone call. Mr. Hickman needs to realize that a child that is approximately 7 years of age is not generally going to speak for a long period of time.

> 10. [Jessica] will allow [MC] to call [Alan] at any reasonable time he wants to. Further, [Jessica] is to foster communication between [MC] and [Alan]. The parties are to be reasonable about phone call times and length of calls. Further it is the Court's desire that the parties use FaceTime or Skype whenever possible. The Court

reiterates that the continued problems with the calls may lead to further action by the Court that will be severe.

11. The Court finds that a majority of the time [Jessica] never answered the phone when [Alan] called. That has to stop. The Court will not have any patience with the problem in the future.

12. The Court is going to modify its previous Orders regarding the time for phone contact. In the Court's view it is not reasonable to call at 7:45 a.m. when the person is trying to get out of the door to school. It is not reasonable to call at 10:00 p.m. if you know he goes to bed at 8:00 p.m. The Court stresses that it is [Jessica's] obligation that if the call did not go through because the child was down the street playing or some other reason he was unavailable that she has the obligation to replace the call as soon as possible and generally that means that day.

Despite these clear orders, the circuit court was presented with evidence that Jessica did not permit Alan to exercise his spring break visitation with MC in 2019, even though the Rhode Island proceedings had been dismissed. It is undisputed that Alan sent text messages to Jessica specifically asking whether she "plan[ned] on allowing [him] visitation for [MC's] spring break per [their] current court ordered arrangements[.]" She failed to respond to any of his inquiries. Instead, Jessica's husband simply texted Alan to "please direct your legal question to [Alan's Rhode Island attorney]." Additionally, it is clear that the circuit court provided Jessica clear directives regarding Alan's communication with MC while in her custody. However, Alan testified that Jessica repeatedly did not allow him to have contact with MC, would hang up the phone during conversations, and would be vacuuming near the phone during conversations. While Jessica denied these allegations, the circuit court was not required to believe her self-serving testimony. Because these actions were in violation of the circuit court's orders, we cannot say that the circuit court clearly erred in finding Jessica

29

in contempt. As such, it is unnecessary for us to specifically address the other alleged actions, and we affirm on this point.

B. Contempt for Filing the Ex Parte Motion in Rhode Island

In paragraph 6 of the court's order, the court found: "Mother is found in willful contempt for continuingly interfering with Father's custody and visitation. . . . She willfully violated the Court's orders by filing actions in Rhode Island in an effort to interfere with his custody and to harass the father." Then, in paragraph 9, the court orders: "Mother shall reimburse Father for his Rhode Island attorney fees in the amount of $6,319.60 within 180 days of entry of this order."

Jessica contends that the circuit court erred in finding her in contempt for filing her action in Rhode Island and awarding Alan attorney's fees incurred in the Rhode Island action. She argues that the circuit court lacked authority to award attorney's fees in a case that was filed and dismissed in Rhode Island. Certainly, a circuit court has the inherent power to award attorney's fees in domestic-relations proceedings, and no statutory authority is required. *See Hargis v. Hargis*, 2019 Ark. 321, 587 S.W.3d 208; *John v. Bolinder*, 2019 Ark. App. 96, 572 S.W.3d 418. However, we agree with Jessica that this inherent authority is inapplicable here because the fees awarded were not from the domestic-relations proceeding before this circuit court but were the result of a proceeding before another jurisdiction.

That said, at the final hearing, Alan specifically requested that he be reimbursed the $6,319.60 in attorney's fees he expended in Rhode Island as a sanction for Jessica's civil contempt. Certainly, a circuit court is authorized to impose a fine for civil contempt. A

contempt fine for willful disobedience that is payable to the complainant is remedial and therefore constitutes a fine for civil contempt. *Omni Holding & Dev. Corp.*, 356 Ark. 440, 156 S.W.3d 228.

As stated previously, before Jessica could be held in contempt for violating the circuit court's order, the order must be definite in its terms and clear as to what duties it imposes. Here, on advice of local counsel in Rhode Island and relying on its interpretation of the UCCJEA, Jessica filed an ex parte motion for relief in Rhode Island. The motion was ultimately dismissed. The record does not reflect that Jessica's filing the ex parte motion in Rhode Island violated any court order in the Pulaski County Circuit Court. As such, we reverse the finding that Jessica was guilty of contempt of court for filing the ex parte motion in Rhode Island and reverse the award of attorney's fees in the amount of $6,319.60.

## VI. *Child Support*

Jessica contends that the circuit court erred in calculating support owed and in imputing full-time income to her. Our standard of review for an appeal from a child-support order is de novo on the record, and we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *David v. David*, 2022 Ark. App. 177, 643 S.W.3d 863. In reviewing a circuit court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be given to their testimony. *Id.* In a child-support determination, the amount of child support lies within the sound discretion of the circuit court, and that court's findings will not be reversed absent an abuse

31

of discretion. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). However, a circuit court's conclusions of law are given no deference on appeal. *Id.*

First, we must note that there were several modifications to child-support orders over the years, and there were several motions, amended motions, and countermotions concerning an increase or a decrease in child support that were pending before the court at the final hearing. Some of the confusion lies in the fact that Alan was sometimes ordered to make biweekly child-support payments, and sometimes he was ordered to make monthly payments. Further, Administrative Order No. 10 changed dramatically during the thirteen-year period that this case has been matriculating.

Jessica argues that the circuit court's calculation of Alan's overpayment was erroneous because the circuit court did not consider its previous order in which Alan was ordered to make biweekly payments and the fact that Alan had underpaid as a result of that previous order. Jessica's argument is misplaced.

In its March 18, 2022, order, the circuit court retroactively modified Alan's child-support obligation. It found that Alan's child-support payment from July 16, 2019, through November 18, 2021, should have been $1,035.68 a month, and from November 19, 2021, forward should have been $1,058.34 a month. The circuit court calculated the amount Alan had overpaid on the basis of the modified amount and attached its calculations to its order. The circuit court determined that Alan was entitled to an overpayment credit of $2,111.94 by taking the amounts Alan should have paid during those time periods on the basis of its modified amount and subtracting the amounts Alan actually paid during those time periods.

We hold that there was no abuse of discretion in the court's methodology and calculations as Jessica contends on appeal.

Jessica also complains that the circuit court's written order states that the modification in child support was retroactive to July 16, 2019, instead of October 28, 2021, as it had orally announced. She contends that the circuit court's change of heart without any intervening change must be considered an abuse of discretion and reversed. Again, we disagree. A court is free to alter its decision after its oral ruling upon further consideration of the matter. *Self v. Dittmer*, 2022 Ark. App. 48, 641 S.W.3d 4. Our law is clear that to the extent a court's oral ruling conflicts with its written order, the written order controls. *Tipton v. Tipton*, 2017 Ark. App. 601; *Howard v. Codling*, 2013 Ark. App. 641.

Last, under this point, Jessica argues that the circuit court erred in imputing full-time income to her even though her husband testified that her being a stay-at-home mother to their children, two of whom have special needs, allowed him to make more money for their family. Jessica argues that the circuit court's refusal to consider this testimony was an abuse of discretion, and its decision must therefore be reversed and remanded. We disagree.

The circuit court decided this case under the "Income Shares Model" adopted by the supreme court in *In re Implementation of Revised Administrative Order No. 10*, 2020 Ark. 131 (per curiam), which became effective on June 30, 2020.[9] Section III, paragraph 8 addresses "Income Imputation Considerations" and provides in pertinent part:

---

[9]Administrative Order No. 10 was again revised on October 6, 2022. However, the version of Administrative Order No. 10 applicable in this case is the version set forth in *In*

33

> If imputation of income is ordered, the court *must take into consideration* the specific circumstances of both parents, to the extent known, including such factors as the parents' assets, residence, employment and earnings history, job skills, educational attainment, literacy, age, health, criminal record and other employment barriers, and record of seeking work, as well as the local job market, the availability of employers willing to hire the parent, prevailing earnings level in the local community, and other relevant background factors in the case.
>
> There is a rebuttable presumption that the payor and the payee can work full-time or earn full-time income, and the court *may calculate* child support based on a determination of potential income that would otherwise ordinarily be available to the parties.
>
> The court *may consider* a disability or the presence of young children or disabled children who must be cared for by the parent as being a reason why a parent is unable to work.

*In re Implementation of Revised Admin. Order No. 10*, 2020 Ark. 131, at 10 (emphasis added).

Even Jessica acknowledges that the circuit court was not *required* to consider that she has two children with special needs as a reason why she was unable to work. In its March 18, 2022, order, the circuit court made the following findings:

> [T]he Court imputes gross monthly income to Mother in the amount of $20.00 per hour on a forty-hour work week which equates to $3,467.20 per month. The Court denies Mother's request to impute income to her for part-time work rather than full-time work. There is a rebuttable presumption that the payor and the payee can work full-time or earn full-time income. The Court finds Mother did not overcome this presumption. The Court is not required to consider the presence of young children or disabled children who must be cared for by the parent as being a reason why a parent is unable to work. The Court considered the specific circumstances of both parents, including the parents' assets, residence, employment and earnings history, job skills, educational attainment, literacy, age, health, criminal record and other employment barriers, [Jessica]'s record of seeking work as well as the local job market and Rhode Island minimum wage which is $12.25 as of January 1, 2022. The Court considered the testimony of the parties as to Mother's earning capabilities.

---

*re Implementation of Revised Administrative Order No. 10*, *supra*, which we will refer to herein simply as "Administrative Order No. 10."

The circuit court heard and considered that before the parties divorced, Jessica was working full time and made approximately $40,000 a year by her own testimony. Jessica's husband, Joshua, testified that he was not working at the time of the hearing. He explained that he and Jessica chose to have Jessica be a stay-at-home mother and care for their three children, ages ten, almost seven, and four, in addition to MC. He said that the four-year-old and ten-year-old have special needs. He explained that he thought he was more "marketable" by Jessica's not working. Jessica testified that if she worked outside the home and was unavailable for care, the children would require a high level of care. Jessica also admitted that both children qualify for a state program that provides institutionalized care but thought the children could be cared for at home. The ten-year-old attends a charter school during the day with another sibling, and the four-year-old attends a pre-K program at certain times during the week according to her exhibit. We give deference to the circuit court on issues of witness credibility. *See Gadberry v. Gadberry*, 2023 Ark. App. 398. After the circuit court heard all the evidence and followed the directives of Administrative Order No. 10(III)(8), we cannot say that the circuit court's decision to impute income as it did for the purposes of calculating child support was an abuse of discretion. As such, we affirm this point.

VII. *AAL Fees*

Finally, Jessica contends that the circuit court erred in its division of AAL fees. She asserts that the circuit court failed to provide any reasons for its refusal to first submit the AAL's fees to the AOC for payment. Alternatively, she argues that the circuit court failed to

provide any rationale why the parties should not bear the cost equally. However, these arguments lack merit. In the absence of a statute or rule requiring specific findings of fact or a timely request for specific findings under Ark. R. Civ. P. 52, we will ordinarily presume that the circuit court made the findings necessary to support its judgment. *Grayson*, 2023 Ark. App. 428, at 8, 675 S.W.3d at 905; *Skinner*, 2020 Ark. App. 407, at 12, 609 S.W.3d at 461.

A circuit court may appoint an AAL if doing so will facilitate a custody case and protect the rights of the child. Ark. Code Ann. § 9-13-101(e)(2) (Supp. 2023). The AAL's fees and reimbursable expenses shall be paid by the AOC from funds appropriated for that purpose. Ark. Code Ann. § 9-13-101(e)(4). The circuit court is required to send a copy of its fee order to the AOC. Ark. Code Ann. § 9-13-101(e)(5)(A). However, the circuit court may also require the parties to pay all or a portion of the ad litem expenses depending on their ability to pay. Ark. Code Ann. § 9-13-101(e)(5)(B).

Jessica's arguments are similar to the arguments made in *Szwedo v. Cyrus*, 2019 Ark. App. 23, 570 S.W.3d 484, that we rejected. In *Szwedo*, we noted that the record did not disclose whether the court's order awarding attorney's fees to the AAL was sent to the AOC. However, we explained that even assuming the statute requires that the order be sent to the AOC and that it was not, Szwedo failed to show prejudice because section 9-13-101(e)(5)(B) nevertheless allowed the circuit court to order the parties to pay the entire amount of the AAL's fees. We went on to explain that it was Szwedo's burden to demonstrate and explain

reversible error.  Moreover, we explained that there was extensive testimony at trial about both parties' incomes and ability to pay the fees and affirmed the circuit court's order.

The same is true here.  It is clear that Jessica cannot show prejudice because section 9-13-101(e)(5)(B) allows the circuit court to order the parties to pay the entire amount of the AAL's fees.  Further, the circuit court heard extensive testimony about both parties' incomes and ability to pay the fees.  In the present case, Jessica demonstrated the ability to hire Rhode Island counsel, hire Arkansas counsel, have a two-day trial, have multiple hearings, and conduct depositions—all of which demonstrate her ability to pay.  As such, we cannot say that the circuit court abused its discretion and affirm this point.

VIII.  *Conclusion*

In conclusion, we affirm in part as set forth above.  We reverse in part the circuit court's finding of contempt and its award of Alan's attorney's fees in the Rhode Island case as set forth above.

Affirmed in part; reversed in part.

KLAPPENBACH and BROWN, JJ., agree.

*Pinnacle Law Firm, PLLC*, by: *Matthew D. Campbell*, for appellant.

*LaCerra, Dickson, Hoover & Rogers, PLLC*, by: *Lauren White Hoover*, for appellee.

37